[Cite as *State v. Studley*, 2011-Ohio-5563.]

IN THE COURT OF APPEALS FOR GREENE COUNTY, OHIO

STATE OF OHIO                               :

    Plaintiff-Appellee                      :       C.A. CASE NO. 2010 CA 81

v.                                          :       T.C. NO.   CRB 1001086

KATHERINE STUDLEY                           :      (Criminal appeal from
                                 Municipal Court)

    Defendant-Appellant                     :

                                               :

. . . . . . . . . .

**O P I N I O N**

Rendered on the   28th   day of    October   , 2011.

. . . . . . . . . .

BETSY DEEDS, Atty. Reg. No. 0076747 and AMELIA N. BLANKENSHIP, Atty. Reg. No.
 0082254, One S. Main Street, Suite 1590, Dayton, Ohio 45402
      Attorneys for Plaintiff-Appellee

JON PAUL RION, Atty. Reg. No. 0067020, 130 W. Second Street, Suite 2150, P. O. Box
1262, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

{¶ 1}   This matter is before the Court on the Notice of Appeal of Katherine Studley,

filed December 6, 2010.  On May 25, 2010, Officer David Holley of the Beavercreek Police

Department cited Studley for underage possession/consumption of alcohol, a misdemeanor

of the first degree, in violation of R.C. 4301.69(E), and possession of drug paraphernalia, in violation of R.C. 2925.14, a misdemeanor of the fourth degree. Studley pled not guilty on June 7, 2010, and she also filed a motion to suppress. On November 19, 2010, after a hearing, the Fairborn Municipal Court overruled Studley's motion to suppress. Studley pled no contest to both charges. The municipal court fined Studley $100.00 for each offense, and sentenced her to 60 days in jail, suspended, for the first degree misdemeanor and to 30 days, suspended, for the misdemeanor of the fourth degree.

{¶ 2} At the suppression hearing, Officer Holley testified that on May 25, 2010, around 3:15 a.m., he was on routine patrol, in a marked cruiser, when he observed a blue Ford van driving approximately 30 miles per hour, "slower than the average traffic, which is 40 miles an hour," on Indian Ripple Road. Holley testified the van was "slowing near the intersections but not turning." The van then turned into a residential plat near I-675. Holley stated that he ran the license plate and determined that the car was registered to an owner at an address in Riverside.

{¶ 3} Holley testified that he was aware of approximately 40 vehicle break-ins and thefts in the area within the last month. Holley testified that no one had been apprehended in connection with the thefts. As he continued to follow the van through the plat, he "noticed the passengers in the back kept looking back at me, moving around from side to side, leaning forward and backwards." Holley "didn't know if they were hiding anything or trying to conceal items from me."[1] Holley stated that the vehicle slowed down and then

---

[1] We note the narrative incident report generated on the date of Studley's arrest, five months before the motion hearing, contains no statement regarding movement in the vehicle prior to the stop.

sped back up through intersections, and that it eventually circled back near to the area where he had initially observed it. Holley testified that, based upon his training and experience, the "sporadic" driving pattern suggested to him that the occupants of the vehicle might be "scouting the area for vehicles to break in, open garages."

{¶ 4} Holley initiated a traffic stop as the van approached Indian Ripple, having followed the van for four or five minutes. He informed the driver, Alan Reddy, "* * * the reason I stopped him was we've had a lot of vehicle break-ins, to me his driving seemed suspicious and I didn't know what was going on and all his passengers were looking back at me, seemed to be concealing items." Reddy responded that he was just aimlessly driving around with his friends before they proceeded home. Reddy did produce a valid driver's license. Holley asked Reddy if there was anything illegal in the vehicle, and he asked him if he could search the van for any items that could be stolen. Reddy consented to the search.

{¶ 5} Officer Duncan arrived on the scene and, for officer safety, Holley asked Reddy and the three passengers in the back seat, one of whom was Studley, to step out of the van. Reddy and the passengers remained with Duncan while Holley searched the van. In the course of his search, Holley discovered a bottle of margarita mix, containing alcohol, that was half full. According to Holley, the bottle "was in between the passenger seat and the driver['s] seat in the middle - - I would call it the cowl (sic) of the van and it was in between all four compartments." Holley stated that Studley identified the bottle as hers voluntarily.

{¶ 6} Duncan advised Holley that he detected alcohol on the breath of Studley and another female passenger. Holley observed that Studley's and the other female passenger's eyes were glassy and red, and that they smelled of alcohol. Holley stated that he

administered the horizontal gaze nystagmus test. He testified that Studley "had nystagmus in her eyes." Holley testified that he placed Studley under arrest, advised her of her rights, and put her in the cruiser. The following exchange occurred:

{¶ 7} "Q. And she admitted the alcohol was hers?

{¶ 8} "A. Yes.

{¶ 9} "Q. Okay. And then what happened?

{¶ 10} "A. Upon arresting Miss Studley, I also located a pipe for smoking marijuana in her purse.

{¶ 11} "Q. Okay. Did she identify the purse as being hers?

{¶ 12} "A. Yes.

{¶ 13} "Q. Did she have it on her?

{¶ 14} "A. It was inside the van.

{¶ 15} "Q. She said it was her purse?

{¶ 16} "A. Yes, she did.

{¶ 17} " * * *

{¶ 18} "A. She also furthered (sic) to tell me that the marijuana pipe was a friend's she was holding for her in her purse and she had forgotten that it was in there.

{¶ 19} "Q. Did you ask her any questions about the pipe?

{¶ 20} "A. After I arrested and Mirandized her and she told me the only thing she knew that it was a friend from college and she was holding the pipe for her.

{¶ 21} "Q. Let's talk about the Miranda. You arrested her for the alcohol?

{¶ 22} "A. Yes.

{¶ 23} "Q.   And when did you give her the Miranda warnings?

{¶ 24} "A.   After I arrested her for the alcohol, right before I put her in the vehicle and searched the purse."

{¶ 25} On cross-examination, Holley testified that he ran the license plate number of the van due to the unusual driving pattern.  He admitted that his report of the incident indicated that he performed a random vehicle verification, and he maintained that his report was inaccurate in that respect.  Holley stated that his computer search revealed that the vehicle was properly licensed and tagged, and he testified that he did not observe any traffic violations.  He agreed that the fact that the vehicle was not registered to an owner in the plat raised his suspicions, and he stated that "only the residents would drive through [the plat], or people visiting residents."   Holley stated that he did not observe any items in the van as he followed it.  Holley testified that there were no vehicle thefts reported on the night of the incident, and he did not search the car in relation to a specific theft.  He testified that there had been thefts the previous evening.  He stated that he had no information linking the van to any of the recent thefts.

{¶ 26} Holley stated that the margarita mix had a cap on it.  He testified that he removed it from the van, without saying anything, and he "put the bottle on the hood of my cruiser so it could be observed by Officer Duncan and the passengers of the vehicle.  Miss Studley offered her statement of it is mine."

{¶ 27} The following exchange occurred:

{¶ 28} "Q.   Okay. And so in response to that then, did you search her purse?

{¶ 29} "A.   Correct.   It was inside the vehicle.

{¶ 30} "Q.   And did you have permission from her to search her purse?

{¶ 31} "* * *

{¶ 32} "A.   Yes, I did.

{¶ 33} "* * *

{¶ 34} "A.   I asked her if she had anything illegal in her purse if she minded if I searched it.   She said to her knowledge there is nothing illegal in the purse.   I then proceeded to search the purse.   Then I found - -

{¶ 35} "* * *

{¶ 36} "A.   - - the pipe of marijuana, sir, and she said, oh I forgot that was in there. I'm holding it for a friend."

{¶ 37} Holley was asked if he included Studley's consent to search her purse in his police report, and he replied that he was "not sure what's in my report."   The following exchange occurred:

{¶ 38} "Q.   Someone giving permission to search their purse would be a significant piece of information to put in your report, wouldn't it?

{¶ 39} "A.   Could be, yes.

{¶ 40} "Q.   The truth to that is it was a search - - when you searched the purse, it was a search pursuant to the arrest for prohibition, wasn't it?

{¶ 41} "A.   Yes.

{¶ 42} "Q.   That was the basis that you had in your mind for the search?

{¶ 43} "A.   I still asked permission, yes, sir."

{¶ 44} Holley stated that Duncan advised him that Studley was under the age of 21,

and that Studley herself also told him that she was 19 years old. Holley stated that Studley was never handcuffed. He testified that Reddy waited for the "paperwork" to be completed, and that Studley returned to the van and left with Reddy and the others.

{¶ 45} On re-direct, Holley testified that the multiple thefts he was aware of had occurred during his shift, between the hours of 11 p.m. and 7:30 a.m.

{¶ 46} In overruling the motion to suppress, the trial court determined that Holley had a reasonable and articulable suspicion to initiate the traffic stop based upon the "high crime area" coupled with the following facts: the van was observed within the time period that the recent thefts had occurred; the owner of the van did not reside in the plat; the van repeatedly sped up and slowed down; the occupants of the van made furtive movements; the van essentially drove in a circle back to where it was initially observed.

{¶ 47} The court further determined that Holley had probable cause to arrest Studley since, after Reddy consented to a search of the van, Holley found an opened, half full bottle of margarita mix that contained alcohol, and Studley volunteered that it belonged to her. The court further noted that Studley smelled of alcohol and had red, glassy eyes.

{¶ 48} The court determined that the search of Studley's purse was proper on two bases, since it was done incident to arrest[2] and since Holley obtained Studley's consent.

{¶ 49} Finally, the court determined that there was no *Miranda* violation, since Studley was advised of her *Miranda* rights at the time of her arrest, and she did not invoke her rights after being advised of them.

---

[2]We note, however, that a physical arrest of Studley was never completed as she was ultimately permitted to return to the vehicle with Reddy and leave the scene.

{¶ 50} Studley asserts two assignments of error. Her first assignment of error is as follows:

{¶ 51} "THE TRIAL COURT ERRED IN UPHOLDING THE STOP OF THE VEHICLE AS THE STOP WAS MADE WITHOUT ANY SUSPICION THIS VEHICLE WAS INVOLVED IN CRIMINAL ACTIVITY."

{¶ 52} According to Studley, the driving pattern that Holley observed is "consistent with many lawful scenarios; a lost driver searching for an address or street, a driver navigating at night through a neighborhood with cars parked along the street, a cautious nighttime driver, etc." Studley further asserts that Holley had no information linking the van to criminal activity, and he did not observe any traffic violations. Studley argues that Holley acted on a hunch.

{¶ 53} "Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted). At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence. (Internal citations omitted)." *State v. Purser*, Greene App. No. 2006 CA 14, 2007-Ohio-190, ¶ 11.

{¶ 54} "Law enforcement officers may briefly stop and detain an individual for investigation if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. That is something more than an unparticularized suspicion or mere hunch, but less than the level of suspicion required for probable cause. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 120 L.Ed. 2d 889; (further citation omitted). To satisfy that standard, police must be able to point to specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the intrusion. (Citations omitted).

{¶ 55} "The propriety of an investigative stop or detention must be viewed in light of the totality of the surrounding facts and circumstances. *State v. Bobo* (1988), 37 Ohio St.3d 177. These circumstances must be viewed through the eyes of a reasonable and prudent police officer on the scene who must react to events as they unfold. (Citation omitted). While a series of events may appear innocent when viewed separately, taken together, they can warrant further investigation. (Citation omitted). For this reason, the court must take into consideration the officer's training and experience and understand how the situation would be viewed by the officer on the street. (Citation omitted)." *State v. Roberts*, Montgomery App. No. 21221, 2006-Ohio-3042, ¶ 7-8.

{¶ 56} In order to determine whether an officer has a reasonable and articulable suspicion justifying a stop, "it is necessary to examine the impetus behind the stop." *State v. Baughman*, Warren App. Nos. CA2010-08-069, 2011-Ohio-162, ¶16. "'[T]he stop and inquiry must be "reasonably related in scope to the justification for their initiation."'" (Citations omitted). Typically, this means

that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." *State v. Mays*, 119 Ohio St.3d 406, 2008- Ohio-4539, ¶ 14.

{¶ 57} "'[I]f an officer, during the initial detention of a motorist, ascertains additional specific and articulable facts that give rise to a reasonable suspicion of criminal activity beyond that which prompted the stop,' * * * 'the officer may further detain the motorist and conduct a more in-depth investigation.' (Citations omitted)." *State v. Little*, Warren App. No. CA2010-12-124, 2011-Ohio-4175, ¶ 15.

{¶ 58} Finally, "'courts still retain their traditional responsibility to guard against police conduct which is overbearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires. When such conduct is identified, it must be condemned by the judiciary and its fruits must be excluded from evidence in criminal trials.'" *State v. Phillips*, Montgomery App. No. 19878, 2003-Ohio-5742, ¶ 24 (quoting *Terry*, at 15.)

{¶ 59} Studley directs our attention to *State v. Carter,* 69 Ohio St.3d 57, 1994-Ohio-343. The arresting officer therein, while in an unmarked cruiser, observed a white Bronco at 10:15 a.m., and he testified that he "vaguely remembered" a police broadcast one or two weeks earlier about a Bronco being involved in a shooting 20-25 blocks from his current location. After briefly losing sight of the vehicle, the officer observed the Bronco parked behind the garage of a

residence in a high crime area. As the officer surveilled the scene, he observed an individual carrying a bundle walk from a back yard and get into the passenger seat of the Bronco, which then pulled away. The officer testified that he suspected a breaking and entering had occurred. When asked what evidence supported that suspicion, he replied, "There was no evidence, counselor, of that happening. That just happened to be a procedural type of thing." This Court determined that the facts available to the arresting officer at the moment of seizure "would not warrant a man of reasonable caution in the belief that the action taken by him was appropriate." Id., at 65.

{¶ 60} Although the facts in *Carter* are more compelling, we cannot find that Holley possessed a reasonable, articulable suspicion of criminal activity. Holley testified that he stopped the van because the occupants "could have been scouting the area for vehicles to break in, open garages or anything like that." This statement is consistent with his police report which was available to the trial court and which states only the following: "On 5-25-10[,] I was on patrol in the area of Indian Ripple and Sylvania. I noticed a blue Ford van (AXP 7508) turn south from Indian Ripple on to Sylvania. I ran a random vehicle verification check on the vehicle and found it came back to an address in Riverside. There have been numerous thefts from motor vehicles in the area so I continued to follow the vehicle. The vehicle continued to drive through the residential area, and would slow periodically as though it was going to turn. The passengers of the vehicle started to turn around and look back at my patrol car in a surreptitious manner. The vehicle exited the plat and turned north onto Darst circling back towards Indian

Ripple. I found the actions of the vehicle and its occupants to be suspicious so I stopped the vehicle."

{¶ 61} According to Holley, in the course of the four to five minutes that he followed the van before initiating the stop, he observed no traffic violations nor indicia of criminal activity. Furthermore, the trial court's characterization of the area as a "high crime area" is not supported by the evidence. A rash of vehicle thefts does not make a residential neighborhood a high crime area, which is normally characterized by drugs, guns and other consistent criminal activity. Even if we were persuaded of the lawfulness of the initial stop,

{¶ 62} the facts do not justify a request to go on a fishing expedition for evidence of some prior theft. There were no additional facts gleaned from the stop to support the officer's initial suspicion regarding criminal activity. Thus, when a motorist is not observed violating any traffic or other laws, and where a police officer is not specifically looking for a particular individual or vehicle, the officer lacks reasonable suspicion to stop and search said vehicle.

{¶ 63} Studley's first assigned error is sustained.

{¶ 64} Studley's second assigned error is as follows:

{¶ 65} "THE TRIAL COURT ERRED IN UPHOLDING THE SEIZURE OF THE MARGARITA MIX AS IT EXCEEDED THE SCOPE OF THE CONSENT AND IT WAS NOT IMMEDIATELY APPARENT TO BE CONTRABAND."

{¶ 66} Based upon our resolution of Studley's first assigned error, analysis of Studley's second assigned error is rendered moot.

{¶ 67} Judgment reversed and remanded for further proceedings consistent

with this court's opinion.

. . . . . . . . . .

HALL, J., concurs in judgment.

GRADY, P.J., dissenting:

{¶ 68} The facts and circumstances that Officer Holley observed parallel in their character the facts and circumstances that were observed by Detective Martin McFadden of the Cleveland Police Department on that bright day in October of 1963 when he stopped and detained John Terry and a confederate on Detective McFadden's suspicion that they were preparing to engage in a "stick-up" of a retail business.  See *Terry v. Ohio*, (1968), 391 U.S. 1, 20 L.Ed.2d 889, 88 S.Ct. 1868.  Further, like Detective McFadden, Officer Holley was informed by his experience, being aware of night time vehicle break-ins in the area through which Defendant and her associates were driving, slowing down and speeding up, during the early hours of the morning.  The reason they gave for acting as they did was insufficient to dispel Officer Holley's reasonable suspicions that they were casing the area for vehicles to break into.  As the Supreme Court wrote in *Terry*, "[i]t would have been poor police work indeed" for Officer Holley "to have failed to investigate this behavior further."  *Id.*, 392 U.S., at 23.

{¶ 69} Having stopped the vehicle in which Defendant was a passenger, Officer Holley asked the driver, Reddy, if there was anything illegal in his vehicle and for consent to search his vehicle.  Reddy consented to the search that Officer Holley performed, which yielded an opened container of what appeared to be intoxicating liquor.  That discovery presented probable cause of a violation of R.C.

4301.62(B)(4).   The officer's further inquiries of Defendant Studley, a passenger in the vehicle who appeared to be alcohol-impaired, produced an admission by Defendant that the container was hers.   Defendant was charged accordingly.

{¶ 70} The record demonstrates that Officer Holley acted not on a mere hunch, but on the basis of specific and reasonable inferences which he was entitled to draw from the facts based on his knowledge.   The trial court correctly denied Defendant's motion to suppress evidence.   I would affirm.

. . . . . . . . . .

Copies mailed to:

Betsy Deeds
Amelia N. Blankenship
Jon Paul Rion
Hon. Beth W. Root