[Cite as *State v. Johnson*, 2013-Ohio-2017.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY

STATE OF OHIO

       Plaintiff-Appellee

v.

ISHMAIL A. JOHNSON

       Defendant-Appellant

Appellate Case No. 2012-CA-13

Trial Court Case No. 2011-CR-171

(Criminal Appeal from
 Common Pleas Court)

. . . . . . . . . . .

O P I N I O N

Rendered on the 17th day of May, 2013.

. . . . . . . . . . .

ROBERT E. LONG, III, Atty. Reg. No. 0066796, Assistant Prosecuting Attorney, Miami County Prosecutor's Office, 201 West Main Street-Safety Building, Troy, Ohio 45373
      Attorney for Plaintiff-Appellee

JAY A. ADAMS, Atty. Reg. No. 0072135, 36 N. Detroit Street, Suite 102, Xenia, Ohio 45385
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1}    Defendant-Appellant, Ishmail Johnson, appeals from his conviction and sentence for Felonious Assault.  After a jury trial that ended in a finding of guilt, Johnson was sentenced to three years in prison.

{¶ 2}    Johnson contends that the trial court erred in overruling in part his motion to suppress.  Johnson also contends that the jury verdict was not supported by the evidence.

{¶ 3}    We conclude that the trial court did not abuse its discretion in partially overruling the motion to suppress.  The police officer who stopped the vehicle in which Johnson was riding had reasonable, articulable suspicion that criminal activity was afoot, and lawfully stopped the vehicle.  In addition, the jury verdict was supported by sufficient evidence.  Accordingly, the judgment of the trial court will be affirmed.

I.   Facts and Course of Proceedings

{¶ 4}    Johnson was indicted in July 2011 on one count of Felonious Assault, in violation of R.C. 2903.11(A)(1).  The charges against Johnson arose from a bar fight at Club 55 in Troy, Ohio, in the early morning hours of May 28, 2011.  At about 2:00 a.m., Troy Police Officer, John Marshall, and Troy Police Sergeant, Jeff Kunkleman, were dispatched to Club 55 on a report that a male was unconscious and bleeding.  Marshall arrived first and found the victim, Coleby Carnes, on the front patio of the business, going in and out of consciousness.  A female, Leslie Blakes, had Carnes's head cradled on her thigh, and blood was all over her thigh.  Marshall was told that a male had jumped over the patio fence, and had kicked and stomped Carnes while he was lying on the ground.  Marshall also learned that the individual left in an orange Avalanche truck and had worn a black, embroidered hoodie-type coat.  Marshall sent this

information out over the radio and waited for medics to arrive.

{¶ 5}     In the meantime, Sergeant Kunkleman was hurrying toward the club.   He had information that the suspect was a tall African-American male traveling in an orange Avalanche truck, but he did not have the information yet about the suspect's clothing.   As Kunkleman came up Dorset Road toward Club 55, he saw a vehicle with the body style of an Avalanche truck coming from the opposite direction. According to Kunkleman, Avalanche trucks have kind of a distinctive shape.   In Kunkleman's opinion, the truck was coming too fast to stop at the stop sign, but it did slow down and basically rolled through the stop sign. The truck then turned right onto McKaig Road.   Kunkleman was about a quarter of a block away at the time.

{¶ 6}     Believing that he had the suspect vehicle in sight, Kunkleman put on his emergency lights and went after the vehicle.   The truck slowed and went toward the curb as if someone were going to jump out, but then backed away from the curb and kept going.   The truck then turned again to the right, onto Crescent Drive.   Kunkleman caught up with the truck on Dorset Road, and hit the truck with a spotlight that lit up the cab of the truck.   However, the truck still did not stop.   At that point, Kunkleman used his siren, and the truck pulled over.

{¶ 7}     Kunkleman approached the truck and made the occupants place their hands on the roof of the truck.   He then began to talk to the driver, Mr. Waller, about what was going on. The defendant, Johnson, was the passenger.    The men told Kunkleman that they knew of the fight at Club 55, and left, like everyone else, because they did not want to be drawn into it.

{¶ 8}     By this time, Marshall had conveyed the information about the black, embroidered hoodie, and Kunkleman concluded that the description matched the clothing that Johnson was wearing.   He, therefore, removed Johnson from the truck, handcuffed him, and

placed him in the cruiser. He also took Johnson's shoes as possible evidence, because dispatch had said that someone had been kicked or stomped. Less than five minutes elapsed between the stop and the time when Johnson was placed in handcuffs.

{¶ 9} Kunkleman went back to talk to Waller, who now indicated that Johnson may have been involved in the altercation. When Kunkleman went back to the cruiser, Johnson made an unsolicited statement, telling Kunkleman that he had been involved in the altercation and had kicked the subject once. Kunkleman had another conversation with Johnson in the cruiser, while on the way back to Club 55, and while on the way to the police station. At this point, Johnson had not been given *Miranda* warnings.

{¶ 10} Kunkleman drove Johnson back to Club 55, with the intention of conducting a "show-up" lineup. However, when he arrived, he learned that this would not be necessary, because the club had a videotape of the incident. The club manager showed Kunkleman the video, which depicted Johnson stomping or kicking Carnes after he was down on the ground.

{¶ 11} On the night of the incident, Coleby Carnes had gone to Club 55 with his father, his uncle, and his best friend. They arrived around 10:30 or 11:00 p.m., and Carnes had about three beers. At some point before the fight, Carnes got into a dispute with Tanisha Sims, who was there with her boyfriend, Clifton Grier. Grier was Johnson's cousin. Nothing physical occurred, but the three were "squaring off" and making comments to each other. According to Sims, she had refused to dance with Carnes, and he would not leave her alone. Eventually, when they were out on the patio, she got irritated and slapped Carnes.

{¶ 12} The video, which was played to the jury, shows the Avalanche truck pulling up at the club. It also shows Johnson getting out of the truck, jumping the fence, and getting into

the situation involving Grier, Sims, and Carnes. The patio was crowded, and the video does not show everything that happened. However, at some point, Carnes was pushed backwards across a table. Carnes landed on his right side. He was conscious and tried to get up, but was taken down again by an impact. Carnes did not know if it was a kick or a fist, but that is when he blacked out. The video does show Johnson kicking Carnes.

{¶ 13} According to Marshall, most of the witnesses at Club 55 either did not see anything or were too intoxicated to be good witnesses. The woman who was holding Carnes's head (Leslie Blakes) filled out a witness statement and testified at trial. Blakes went to the bar that night by herself, because her girlfriend was a bartender there. Blakes arrived about 9:30 p.m., and had only two drinks. She was not intoxicated. At some point, Blakes happened to go out to the patio and saw a man being assaulted. When she came out the door to the patio, she saw the man (Carnes) fall to the ground. Blakes then saw a tall man "stomping" on Carnes's face. She did not see who had pushed Carnes. Blakes identified Johnson as the person stomping, and stated that the stomps occurred quickly, and there were several stomps – more than three. Carnes initially tried to get up and was conscious, but by the time Blakes got to him, he was unconscious. Blakes yelled at Johnson, asking him to stop, which he did. Johnson then left the bar. Blakes held Carnes's head until the emergency squad arrived.

{¶ 14} While Blakes was filling out a witness statement, Officer Marshall observed Grier and Sims trying to intimidate Blakes. Sims started calling Blakes a "snitch," and Grier later approached Blakes and said, "Bitch, you'll get yours." Trial Transcript, Volume I, p. 92. Both Grier and Sims were arrested for attempting to intimidate a witness.

{¶ 15} Carnes sustained a broken arm and a concussion, and had five staples in the

back of his head as a result of the incident. Carnes's left arm was broken in three places, and he was required to wear a cast for about seven weeks. He testified that he has less mobility in his arm than he did before the incident.

{¶ 16} After viewing the video, Kunkleman took Johnson to the police station and administered *Miranda* warnings, after which Johnson waived his rights and agreed to speak with the police. Johnson admitted kicking Carnes two or three times. Johnson was adamant that he had not pushed Carnes, but admitted that he kicked him after he was down. A few weeks before the trial, Johnson also ran into Carnes at a party, and stated that he was sorry that the incident had happened.

{¶ 17} As was noted, Johnson was charged with Felonious Assault. Prior to trial, Johnson filed a motion to suppress the statements he made to the police. After an evidentiary hearing on the matter, the trial court sustained the motion in part and overruled it in part. The trial court stated that it found Sergeant Kunkleman, who was the only witness, credible. However, the court concluded that the statements in the cruiser, other than Johnson's unsolicited statement, would not be admissible because Johnson had not been given *Miranda* warnings. The trial court additionally held that any statements Johnson made at the police station, following administration of proper warnings, were admissible.

{¶ 18} A jury trial was held in May 2012, and the jury found Johnson guilty of Felonious Assault. He was sentenced accordingly, and now appeals from the conviction and sentence.

II. Did the Trial Court Err in Overruling in Part the Motion to Suppress?

**{¶ 19}**   Johnson's First Assignment of Error states that:

The Trial Court Erred in Overruling in Part the Motion to Suppress.

**{¶ 20}**   Under this assignment of error, Johnson contends that Sergeant Kunkleman lacked reasonable suspicion for the initial traffic stop.   In this regard, Johnson focuses on Kunkleman's statement at the suppression hearing, when he indicated on cross-examination that the Avalanche truck may have made a legal stop at the stop sign.

**{¶ 21}**   The standards for reviewing decisions on suppression motions are well-settled. In ruling on motions to suppress, "the trial court assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*,   93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994), citing *State v. Clay*, 34 Ohio St.2d 250, 298 N.E.2d 137 (1973).   Thus, when we review suppression decisions, "we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence.   Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

**{¶ 22}**   In *State v. Roberts*, 2d Dist. Montgomery No. 23219, 2010-Ohio-300, ¶ 14, we noted that:

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures.  *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.   Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal

activity may be afoot. *State v. Martin*, Montgomery App. No. 20270, 2004-Ohio-2738, at ¶ 10, citing *Terry, supra*; *State v. Molette*, Montgomery App. No. 19694, 2003-Ohio-5965, at ¶ 10. A police officer may lawfully stop a vehicle, motorized or otherwise, if he has a reasonable articulable suspicion that the operator has engaged in criminal activity, including a minor traffic violation. See *State v. Buckner*, Montgomery App. No. 21892, 2007-Ohio-4329, ¶ 8. (Italics added.)

{¶ 23} In the case before us, Kunkleman had a reasonable, articulable suspicion that criminal activity might be afoot. Before initiating the traffic stop, he had information that the suspect left the scene in an orange Avalanche truck. Kunkleman indicated that the shape of this type of truck is somewhat distinctive. On Kunkleman's way to the crime scene, he observed an orange Avalanche driving towards him, away from the scene, at a rate of speed that caused it to come to the stop sign more quickly than normal. Under the circumstances, this was sufficient to cause reasonable suspicion. The hour was very late, and the likelihood is very low that two orange trucks of this type would be seen driving away from the vicinity of the crime. Kunkleman stated that he was not close enough to tell if the truck had stopped, but he also said that it appeared to have rolled through the stop sign. On cross-examination, Kunkleman did indicate that it was possible that the truck may have made a legal stop. However, this is irrelevant, because Kunkleman already had a reasonable suspicion that criminal activity was afoot. His suspicions would have been even more heightened when the vehicle failed to stop after he turned on his lights, but instead drove closer to the curb as if one of the occupants intended to jump out.

{¶ 24}   In arguing that the trial court should have suppressed the evidence, Johnson relies on two prior cases from our district – *State v. Lindsey*, 2d Dist. Montgomery No. 24943, 2012-Ohio-3105, and *State v. Studley*, 2d Dist. Greene No. 2010 CA 81, 2011-Ohio-5563. However, these cases are distinguishable.

{¶ 25}   In *Studley*, we concluded that a police officer did not have a reasonable, articulable suspicion of criminal activity, where he did not observe the motorist violating any traffic laws and was not looking for a particularized individual or vehicle. *Id.* at ¶ 62. Similarly, in *Lindsey*, the officer was not looking for a vehicle similar to the one the defendant was driving, and we again concluded that the officer did not have reasonable, articulable suspicion to stop the vehicle. *Lindsey* at ¶ 15-18.   In contrast, Sergeant Kunkleman was looking for a specific vehicle and found it near the crime scene.

{¶ 26}   Accordingly, the trial court did not err in only partly sustaining the motion to suppress.   The First Assignment of Error is overruled.

### III.   Was the Jury's Verdict Supported by Sufficient Evidence?

{¶ 27}   Johnson's Second Assignment of Error is as follows:

The Verdict of the Jury Was Not Supported by Sufficient Evidence.

{¶ 28}   Under this assignment of error, Johnson contends that the jury verdict was not supported by sufficient evidence.   Johnson's argument in this regard is that the State failed to introduce sufficient evidence that Johnson caused Carnes's injuries.

{¶ 29}   "Sufficiency and manifest-weight challenges are separate and legally distinct determinations."   *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632, ¶ 17

(2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). " 'While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion.' " *Hatten* at ¶ 17, quoting *State v. Adelman*, 9th Dist. Summit No. 18824, 1998 WL 852565, *7 (Dec. 9, 1998).

{¶ 30}    We noted in *Hatten* that:

A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. Under a sufficiency analysis, an appellate court does not make any determinations regarding the credibility of witnesses. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. (Citations omitted.) *Hatten* at ¶ 18.

{¶ 31}    Johnson was charged with having violated R.C. 2903.11(A)(1), which provides, in pertinent part, that "No person shall knowingly * * * [c]ause serious physical harm to another or to another's unborn * * *."

{¶ 32}    Johnson concedes on appeal that the laceration in Carnes's head, as well as the broken arm, and, potentially, the concussion, fulfill the requirement of serious physical harm in R.C. 2903.11(A)(1).   However, in arguing that the evidence was insufficient, Johnson focuses on the fact that Carnes failed to testify that Johnson was the cause of his injuries.   Johnson also stresses that another individual, Tanisha Sims, pled to a charge of having assaulted Carnes. Finally, Johnson notes that there was no blood or physical evidence demonstrating that Johnson's shoes were linked to the injuries.

{¶ 33}    As an initial matter, we note that Sims testified that she became irritated with Carnes and slapped him.   This conduct resulted in an assault charge against Sims.   However, Sims also testified that after she slapped Carnes, there was a crowd around Carnes, and Carnes then "hit" the table.   In addition, Sims testified that when the crowd cleared, Carnes was on the ground.   Under the circumstances, it is apparent that the slap did not cause Carnes's broken arm, concussion, or lacerated scalp.   It is also apparent that Sims did not have a good view of what occurred.

{¶ 34}    Eyewitness testimony, as well as the surveillance video from Club 55, show Johnson assaulting Carnes by stomping on his face.   The head wound was also on the back of Carnes's head, not the front, and the "stomps" occurred in quick succession, after which Johnson left the premises.   Thus, the lack of blood on Johnson's shoes is entirely plausible and consistent with the evidence.

{¶ 35}    Carnes testified that he fell on his right side when he landed on the ground, but his left arm, not his right arm, was the one that was broken – and the arm was broken in three places.   A reasonable inference is that Carnes's arm was not broken by the fall, but was caused

by Johnson's "stomping" or kicking.

**{¶ 36}** Furthermore, Carnes testified that no one other than Johnson was around him after he fell. Both Carnes and an eyewitness indicated that Carnes was conscious and did try to get up before he was prevented from doing so by Johnson's foot. Again, a reasonable inference is that Johnson caused the concussion and head wound, as well as the broken arm.

**{¶ 37}** Even if we assumed for purposes of argument that Johnson did not cause Carnes's broken arm, any rational trier of fact could still conclude that Johnson caused Carnes's concussion and head wound, which are conceded to have caused serious physical harm.

**{¶ 38}** Based on the preceding discussion, the Second Assignment of Error is without merit.

## IV.  Conclusion

**{¶ 39}** Both of Johnson's assignments of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

FAIN, P.J. and HALL, J., concur.

Copies mailed to:

Robert E. Long, III
Jay A. Adams
Hon. Christopher Gee