[Cite as *State v. Terrell*, 2017-Ohio-7097.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

STATE OF OHIO                                    :
                                                 :
    Plaintiff-Appellee                          :        C.A. CASE NO.   2016-CA-32
                                                 :
v.                                               :        T.C. NO. 15CR263
                                                 :
ANDRE TERRELL                                    :        (Criminal Appeal from
                                                 :         Common Pleas Court)
    Defendant-Appellant                         :
                                                 :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____4th____ day of _____August_____, 2017.

. . . . . . . . . .

MEGAN M. FARLEY, Atty. Reg. No. 0088515, Assistant Prosecuting Attorney, 50 E. Columbia Street, Suite 449, Springfield, Ohio 45502
    Attorney for Plaintiff-Appellee

ROGER SOROKA, Atty. Reg. No. 0082195 and JOSHUA BEDTELYON, Atty. Reg. No. 0087866, 503 South Front Street, Suite 205, Columbus, Ohio 43215
    Attorneys for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the Notice of Appeal of Andre Terrell, filed May 6, 2016.  Terrell appeals from his April 27, 2016 judgment entry of conviction, following a jury trial on one count of trafficking in cocaine, a felony of the first degree, in violation of R.C. 2925.03(A)(2), as set forth in count one of the indictment; possession of

cocaine, a felony of the first degree, in violation of R.C. 2925.11(A), as set forth in count two of the indictment; and aggravated possession of drugs, a felony of the fifth degree, in violation of R.C. 2925.11, as set forth in count three of the indictment. The indictment also contained a forfeiture specification as to counts one through three. The court merged counts one and two and the State elected to proceed to disposition on count one. The court sentenced Terrell to 11 years for trafficking in cocaine and one year for aggravated possession of drugs, to be served consecutively.

{¶ 2} Terrell was indicted on May 26, 2015, and he filed a motion to suppress on August 6, 2015. The events surrounding Terrell's arrest occurred at the Marriott Hotel in Springfield, and in his motion to suppress, Terrell asserted that the arresting officers' encounter with him there was without reasonable, articulable suspicion, that Terrell's consent to the search of his person was involuntary, that the search warrant the officers obtained for Terrell's hotel room was not supported by probable cause, and that Terrell had an expectation of privacy in his hotel room. The motion was set for a hearing on August 21, 2015, and on August 11, 2015, Terrell moved for an extension of time. The hearing was rescheduled for October 2, 2015.

{¶ 3} On that date, William McMahan testified that he previously worked as a contract security guard for Elite Investigation and Security Group, and that he was so employed on March 31, April 1, 2015. He testified that he was assigned to the Marriott Hotel in Springfield at the time, having worked there for approximately five months. McMahan stated that he was assigned to the third shift, from 11:00 p.m. until 7:00 a.m. He stated that he was familiar with a typical evening at the hotel. The following exchange occurred:

Q. * * * And going to the evening of March 31st and the morning of April 1st, did you see something that led you to call the police department that evening?

A. I did.

Q. Just tell us everything that was going on that led up to you making the decision to call the police department that evening?

A. I noticed some activity in the parking lot, a couple of different people showing up, and then they would meet with the person in the van, leave, and then he would leave and come back a few minutes later, go up to his room, come back down, and leave again, come back, go up. It became repetitious.

It had happened one time prior before. I really didn't pay that much attention to it at that time. This time it became a little more apparent.

Q. And the time prior before, are you talking about a different day altogether?

A. Yes.

Q. And was that involving the same person?

A. Yes.

Q. And was that person a guest in the hotel?

A. Yes.

McMahan identified Terrell as the person he observed.

{¶ 4} When asked if Terrell's behavior was unusual for the parking lot of the hotel, McMahan responded, "Absolutely." He testified, "To me, it looked like a meet, maybe

they were meeting up to either collect or supply with drugs, I'm assuming. The first time, * * * the same vehicle had showed up prior to him coming down from his room, and then this time that vehicle had showed up, as well. So I just had to assume that there was something going on." McMahan stated that it is not common for him to contact the police in the course of his shift, and that the "main reason that I called was the odor of marijuana when I walked by the van."

{¶ 5} McMahan stated that the police arrived at the scene at approximately 2:30 a.m., and that he was in the parking lot at the time. The following exchange occurred:

Q. And at some point, are you there when the Defendant, Andre Terrell, is out of his vehicle and next to a police vehicle and they're talking to him?

A. Yes. Actually, when the police arrived, I stayed in my vehicle for, approximately, a minute just to make note of what time they, approximately, showed up. And then I got out and went over and stood closer to the police vehicle just to hear what was going on.

Q. * * * And what, did you observe the interaction between the officer and the Defendant? Was the officer patting him down or what was going on?

A. It was questioning while he was in the van at first, and then from what I witnessed, it was the odor of what was coming out of the van that got him out of the van. Then it seemed to be the normal questions, do you have anything on you?

Q. Did you hear the officer ask Mr. Terrell if he could search his

person?

A.   Yes.

Q.   What was Mr. Terrell's response?

A.   Yes.

Q.   Did you also, you knew that Mr. Terrell was a guest in the hotel; is that correct?

A. I did.

Q.   And did you provide the police with information about what [sic], where he was staying at that time?

A.   From what the front desk had told me, yes.

{¶ 6}   When asked on cross-examination to describe Terrell's comings and goings on the night of his arrest, McMahan testified as follows:

Normally about, it seemed it was around midnight that he had come down.   There was a vehicle that pulled in to meet with him.   It was a dark blue Tahoe, I believe.   I didn't really get to see what was going on as far as that goes, but when he did leave, he would leave for roughly 20 minutes and then come back, go up to the room for five, ten minutes, come back down, and leave, that was after that person had already left.

McMahan testified that he observed this sequence of events four times.   McMahan stated that smoking is not allowed in the hotel, and that it was common for him to observe guests smoking outside the hotel, as well as in their cars when it was cold outside.

{¶ 7}   Officer Jared Osborne testified that he is employed by the Springfield Police Department, and that he conducts uniformed patrol, having been so employed for over

seven years.   Osborne testified that he was dispatched to the Springfield Marriott on April 1, 2015, at approximately 2:30 a.m.   Osborne stated that there "was a drug complaint called in by staff at the Marriott that was relaying information for a security guard that worked there, including specific information about the identity of a vehicle that was involved."   The following exchange occurred:

Q.   And tell me what happens when you arrive on scene.

A.   I locate the vehicle that they had dispatched us out there to check.   It was a white Dodge Grand Caravan.   When I got into the parking lot, I immediately picked out the van.   When I pulled up to it, I observed a male getting out of the passenger seat.   I went up to the male, identified him as Aaron Minter, and as the door was opened, I could smell a very strong odor of raw, burnt marijuana coming from the car, or from the van. I just began asking Mr. Minter simple questions about what he was doing there, how long they had been there, and he didn't really want to answer a whole lot.

But he, ultimately, told me that he was there to visit Mr. Terrell.   He was friends with him.   The van is, kind of, tall.   I had another officer that was there who was speaking with Mr. Terrell on the other side of the van, and I told him that I had smelled marijuana and was going to search the van.

Upon searching the van, I found a bag with, it had a plastic container in it, contained scissors, and some M&M packages containing small bags of marijuana.   At some point during this search, I heard over my portable

radio that Officer McCarty had detained Mr. Terrell.

I wondered what was going on. I didn't see this but I had stopped what I was doing, and he was placing Mr. Terrell in the back of the cruiser. And he had showed me what appeared to be, I initially thought it might be methamphetamine or some type of designer drug that was inside a clear baggy [sic] that he had got from Mr. Terrell's right front pocket.

Q. At that point in time, did Officer McCarty contact Detective Mitchell on how to proceed from there?

A. Correct.

Q. And while he was doing that, did you speak briefly to Mr. Terrell?

A. I did.

Q. And what did you tell him?

A. I read Mr. Terrell his Miranda Rights. He nodded, stated that he understood. He initially told me that, I also heard him say that he was there in Room 615, and he had told me that he was there to visit a female that was at the hotel.

When I started asking who the female was and how he gets ahold of her, he didn't want to tell me, and I remember also asking him if we were able to get ahold of this female, would she give us consent to search the room that she was in. And he said that he didn't want to get her in trouble, and, at that point, he didn't want to answer any more questions.

Q. * * * Did that all occur while he was in the back of the cruiser?

A. Correct.

Q. Were you involved in the search of his person at all?

A. No.

Q. And Officer McCarty had the primary interaction with Mr. Terrell at the scene up until that point?

A. Correct.

{¶ 8} Osborne testified that after Detective Mitchell responded to the hotel and spoke to the officers on the scene, Mitchell left to obtain a search warrant. The following exchange occurred:

Q. Prior to that time, were you instructed to go secure Room 623 at the hotel?

A. I was. After we had found the suspected meth-amphetamine/designer drug, after calling Detective Mitchell I went up to the room, initially checked it for people. That's it. Left the room and stayed there until the search warrant was brought up.

Q. Did the hotel give you access to the room or did you have to force entry by breaking the door?

A. No. They gave us a key card to the room to gain access.

Q. Was anybody in the room?

A. No.

Q. Did you search through any of the areas in the room or were you just looking for people to make sure that nobody was able to destroy anything?

A. I was just looking for people. I didn't open anything or touch

anything.

**{¶ 9}** On cross-examination, Osborne testified that Minter was exiting the front passenger seat of Terrell's van as Osborne pulled up to the vehicle. Osborne stated that he believed the vehicle was a rental. He stated that he did not ask permission to search the van. At the time, he testified that McCarty was on the driver's side of the van. Osborne stated that he could hear McCarty and Terrell talking on the other side of the van, but he could not make out what they were saying. Osborne stated that he did not hear Terrell consent to a search of his person.

**{¶ 10}** According to Osborne, Terrell's room was on the sixth floor. When asked why he proceeded to the room, Osborne responded, "To, basically do a sweep of the room to make sure that there was nobody inside of it and exit the room. After that, just stayed there so nobody could gain access to the room while they were in the process of obtaining the search warrant." The following exchange occurred:

Q. Did you have any reason to believe there were other people in the room?

A. I didn't know, and that's why I done that.

Q. But nobody had ever said that there were other people in the room; is that correct?

A. No.

Q. And were you, did you have any reason to believe that any crimes were being committed in the room at that point?

A. There was, I believe, personally believe that there was some type of drug activity going on in there because the Caravan smelled like

marijuana. Mr. Terrell and Mr. Minter are both career criminals for being drug dealers. There was a security guard telling us that he thought there was drug activity going on between the two of them with contraband. I believed that there was some type of trafficking going on inside the room.

Q. * * * And the specific room, could you smell marijuana emitting from the hotel room?

A. No. I couldn't smell marijuana coming from the room.

* * *

Q. And why did you, I guess, classify Mr. Minter and Mr. Terrell as career criminals. How do you qualify that?

A. That's just something that we identify certain people with in our department with their prior activity.

Q. * * * And when you say prior activity, what do you mean specifically?

A. If he's been arrested for possession, dealing drugs before. It's just something that our dispatcher would notify us of when we were, if we were to go out and run somebody's name and check them for warrant.

Q. What did you hear from outside of Mr. Terrell's room, Room 623? Could you hear any noises coming from inside the room?

A. No.

Q. So you had no reason to believe somebody inside was in need of assistance or anything like that; is that correct?

A. That's correct.

Q. Did you suspect that there were armed individuals in the room for any reason?

A. No.

Q. So I guess to go back to your previous testimony, your intention was to go in the room and do what?

A. Just make sure there was nobody inside of the room to destroy anything that would be inside.

* * *

Q. * * * And how long were you in Room 623 at this point?

A. I would say I was in there less than 10 seconds.

Q. And how much prior in time to the search warrant coming did you enter Mr. Terrell's room?

A. It was a couple hours. I don't recall exactly how long it was.

{¶ 11} Detective Gerald Mitchell testified that he is assigned to the intelligence unit, which is commonly referred to as the drug unit, in the Springfield Police Division, having been so employed for over three years. He testified that on April 1, 2015, at about 3:00 a.m., he received a phone call from McCarty about suspected drug activity at the Springfield Marriott. He stated that he learned that the officers had recovered "a substance that they believed was meth, as well as some marijuana." According to Mitchell, there "had been some disagreement between, or difference between what room [Terrell] said he was in and what room the hotel said he was actually in, and I asked Officer McCarty to inform Mr. Terrell of his rights and ask him, again, what room he was in and if he would give consent to search that room." Mitchell testified that he then

received a return call from McCarty advising him that "Officer Osborne had informed and asked [Terrell] what room he was in. Ultimately, he said he was not a guest at the hotel, that he was meeting a female in Room 615."

{¶ 12} Mitchell stated that he later responded to the hotel, and the following exchange occurred:

Q. * * * What did you do when you got on scene?

A. First thing I did was I spoke with Officer McCarty, took some photographs of the evidence that he had collected, and, at that point, I believe I searched the van. My primary goal was to find the hotel key, hotel key for 623.

Q. So you had been informed that there was a room key at some point and you were looking to see if you could find it in the van?

A. Yes. Officer McCarty advised that upon initial contact with Mr. Terrell, Mr. Terrell showed him a room key that said Marriott on it, and after he had arrested him, he could not find that same key.

Q. Did he also show you the items that were found in Mr. Terrell's pockets?

A. He did.

Q. Describe those items for me.

A. There was a crystalline substance, and there was some marijuana. I don't recall whether that was from his pockets or from the vehicle. There was a notepad or notebook with what appeared to be dollar amounts written on it and some names.

Q.   And did you attempt to conduct what is commonly called a field test on the crystalline substance?

A.   I did.

Q.   And what were the results of that?

A.   The results indicated the presence of either amphetamines or analogues of MDMA.

Q.   And the notebook that was in his pocket, was one of the names written on there Ills, I-L-L-S?

A.   I don't recall how it was spelled, but it was Ills, yes.

Q.   Do you know a person who goes by the name of ILLS in the city of Springfield?

A.   I do.

Q.   And who is that?

A.   Aaron Minter.

{¶ 13} Mitchell stated that he was aware that Terrell had been advised of his rights, and that he spoke to Terrell in the back of the cruiser and asked if he would consent to a search of his room.   According to Mitchell, Terrell advised him that he wanted to speak to his attorney.   He testified that Terrell did not appear to be intoxicated.   The following exchange occurred:

Q.   You then sought to get a search warrant for hotel room 623, correct?

A.   Right.

Q.   And prior to that, knowing that you were intending to do so, about

how long would that have taken or how long did it take to get the search warrant from that time until it was actually signed? * * *

A. I remember getting to the hotel around 4:00 a.m. I believe we executed the search warrant after 9:00 a.m., so we would have had the search warrant signed sometime between 8:00 and 9:00 after a judge would have arrived at work.

Q. And because of that long period of time, were you interested in securing the hotel room?

* * *

A. Yes.

Q. And did you enter the room and secure it so that nothing could leave before the search warrant was obtained?

A. I did not. Sergeant Bennett did.

Q. But you were aware that that had taken place?

A. I was aware, yes.

On cross-examination, Mitchell stated that he did not find a room key in the van in the course of his search.

{¶ 14} Officer Tyler McCarty testified that he has been a police officer with the City of Springfield for over six years. He stated that on April 1, 2015, he was dispatched to the Springfield Marriott, and that the "call was there was a white van parked on the lot with two occupants. They looked suspicious. They kept going in and out of the hotel to the van, and the caller thought it might have been drug activity." The following exchange occurred:

Q. * * * Tell us what happens when you arrive on scene. What do you see?

A. I pulled in right after my partner, Officer Osborne. He was the first one to pull up to the van, located him right away. As I was pulling up behind him, I saw a driver getting out, and there was a passenger getting out on the passenger front side.

Officer Osborne went up to the passenger side. I went up to the driver's side. As I was coming up to the driver's side, I made contact with Mr. Terrell. He already had his door shut, and I just started talking to him.

* * *

Q. Do you recall your conversation?

A. As soon as I started walking up to Mr. Terrell and talking to him, he told me that he was [a] guest at the hotel. He told me he was staying there. There was a security guard for the hotel sitting in his car in the lot, and he started pointing to the security guard saying, he knows I'm staying here. He's seen me in and out the past few days.

Q. Did he show you a room key of some kind, as well?

A. He did.

Q. And do you recall what room he told you he was staying in?

A. I believe he said 615.

Q. And around that time, did Officer Osborne inform you he was going to search the vehicle?

A. Yes. Officer Osborne told me he could smell the odor of

marijuana coming from the vehicle and that he was going to search it.

Q. And what did you do with Mr. Terrell at that time?

A. I asked Mr. Terrell if I could check to make sure if he had anything on him, any weapons, or drugs or anything of that nature. He said he didn't. I asked if he minded if I searched him. He said he didn't. I asked Mr. Terrell if he actually minded if I checked inside his pockets. He said he did not. And the security guard was standing next to me the whole time that went on.

Q. And was Mr. Terrell in handcuffs at that point in time?

A. No, sir.

Q. And then you checked his pockets after he gave you permission to do so?

A. Yes.

Q. Did you find anything inside?

A. I found a small M&Ms bottle with a small plastic baggy [sic] of marijuana, and then the smaller right pocket I found a bag of a rocklike substance that we were not sure what it was at that time.

McCarty stated that Terrell did not make any statements about the substance, and that McCarty did not ask any questions about it.

{¶ 15} McCarty stated that the "security guard had came back out after going inside and checking the rooms, and he told us that, I think it was Room 623 that Mr. Terrell was actually staying in." The following exchange occurred regarding the search of Room 623:

Q. And at some point did you actually enter the room to make sure nobody was inside?

A. Yes.

Q. How did that actually happen? * * *

A. We were told just to secure the room. If we heard anybody in there or thought anybody was in there, you know, just briefly walk through and check for people, not anything else. We stood out of the room for about a minute, a couple of minutes or so, approximately.

And we could hear what we thought was people talking inside so we knocked on the door several times and asked people to come out. Nobody was answering, nobody was responding, then we entered the room, briefly walked through to make sure there was no people in there, and it was actually, the TV was on and the volume was down kind of low.

Q. And did you leave the room and wait until a search warrant had actually been obtained before any further searching occurred?

A. Yes.

{¶ 16} On cross-examination, McCarty was shown a copy of an "inner office" completed by him on April 1, 2015, and he was given an opportunity to read it over. The following exchange occurred:

Q. * * * So in the report, what did you say Mr. Terrell, what his response was to whether or not you could search him?

A. I then asked Mr. Terrell if he had anything illegal on his person and he replied that he did not. I asked Mr. Terrell if I could check his

pockets, and he stated that he did not care. I then asked Mr. Terrell if I could reach into his pockets to check them, and, again, he replied that he did not care.

Q. Did you take, I don't care, as an affirmative response that you could?

A. Yes.

Q. Officer, was this a weapons pat down?

A. Just was pat down for anything illegal. So I asked if I could search him before I even patted him down or looked into his pockets.

Q. So this was a search for illegal contraband?

A. Yes.

Q. And what was the cause for this search for illegal contraband again?

A. Officer Osborne smelling marijuana coming from the vehicle.

McCarty stated that Terrell was not under arrest at the time of the pat down, but that he was being detained based upon the odor of marijuana from the van.

{¶ 17} The following exchange occurred regarding Room 623:

Q. And you rode up the elevator how many floors?

A. Six.

Q. And did you believe that, and what was the intent of going into the room at that point?

A. Just to secure it.

Q. And, well, secure it from what?

A.   Make sure there was nobody in there that could destroy any possible evidence before we could search it.

Q.   And did you have any reason to believe there was anyone in there?

A.   Yes.

Q.   And what was that?

A.   Mr. Terrell said, at some point, he was with some female in the room.

* * *

Q.   How long were you in the room?

A.   Maybe a minute or less.

* * *

Q.   And what did you do when you entered the room?   Can you just walk us through that?

A.   I entered the room, I believe, to the right.   There was a bathroom. You just kept going, and there was a couple beds and then it dead-ended into the wall.   So just walk straight and looked in between the beds and the bed and wall, came back out, and I believe somebody just walked in the bathroom and checked in the shower to make sure nobody was in there and we left.

Q. * * * And how many people were in the room with you at this point?

A.   I can't remember.

* * *

Q. Did you notice anybody opening drawers or looking in any cabinets or - -

A. No.

Q. * * * If you were searching for people, did you knock on the door prior to entering the room?

A. Yes.

Q. Did you receive any response from inside?

A. No.

Q. Why did you, at that point, not, I guess, just stand guard at the door? Why did you feel the need to enter the room?

A. Because we could hear voices inside, very faint voices, so we thought maybe somebody was inside.

Q. And those voices were emitting from the television set; is that correct?

A. Yes.

Q. So when you opened the door and saw that the television set was on, I guess why, at that point, did you feel it necessary to continue to search the room?

A. Because we were making sure that that was the only thing they were coming from was the TV.

{¶ 18} On recross-examination, the following exchange occurred regarding the pat down search of Terrell: "Q. * * * After testimony and you reading your report again, did Mr. Terrell at any point give an affirmative yes to the question whether or not you could

search him?   A.   No.   He didn't give an affirmative no either."

{¶ 19} At the conclusion of the hearing, the following exchange occurred:

MR. PICEK: The State would have no further witnesses.   We would have the search warrant, which has been marked as State's Exhibit No.1. Your Honor signed that search warrant.   At least, my understanding is, at least, that portion of the motion to suppress should go to another judge to rule on.

They're [sic] challenged to whether the search warrant should have been issued.   * * *

THE COURT:   * * *With respect to the search warrant, whether or not that should have been issued, certainly I'll recuse myself from that portion of the motion and refer that to the administrative judge who will most likely assign that to Judge O'Neill to review. * * *."

{¶ 20} On October 5, 2015, the trial court issued an Entry that provides, "* * * the Court finds that a portion of the subject of the defendant's motion is a search warrant that this judge signed.   THEREFORE, this case is TRANSFERRED to the Administrative Judge * * *  to assign to another judge for the limited purpose of hearing the portion of defendant's motion to suppress that deals with the search warrant. * * * ."

{¶ 21} On October 13, 2015, the "State of Ohio's Closing Argument for Suppression Hearing" was filed. The State asserted that the arresting officers had a reasonable suspicion to detain Terrell, that he consented to a search of his person, and that the search of his vehicle was supported by probable cause.   On October 16, 2015, Terrell filed "Defendant's Brief in Support of Suppression."   On October 27, 2015, the

court issued an Entry that provides that "Defendant's motion to suppress is OVERRULED for the reasons set forth in State's written closing argument." Terrell filed a Notice of Appeal of the trial court's decision, which this Court dismissed on the State's motion to dismiss for lack of a final appealable order.

{¶ 22} On November 9, 2015, a hearing was held on the remaining portion of Terrell's motion to suppress before the newly assigned judge. The following exchange occurred at the start of the hearing:

> MR. PICEK: A hearing was held before Judge Rastatter, regarding the parts of the motion that do not deal with the search warrant. Mainly, regarding an encounter with the Defendant and law enforcement that was in the parking lot of a hotel and the search of his person, at that time. That has been ruled on in the State's favor. The only issues remaining were the Defendant's motion to suppress are what, I believe, [sic] are under subsections F and G, regarding the search warrant. It's beginning on page, 13, I believe, of the Defendant's motion.

> THE COURT: Section F says, the search warrant that was created by Detective Mitchell was defective. And G says that the Defendant has an expectation of privacy at the hotel room and that the search of the hotel room was unconstitutional. Those are the two parts of the motion to be presented, the argument before the court today.

{¶ 23} A copy of the search warrant for room 623 at the Marriott was marked as an exhibit, along with an accompanying affidavit. The State indicated that, "[r]egarding whether the Defendant has [an] expectation of privacy in his hotel room, this room was

checked out under his name and it is, obviously, the State's position that it is his room, so we'd agree. But, they had a search warrant." The State noted that the "remainder of the challenge of the search warrant is solely regarding whether there was sufficient probable cause."

{¶ 24} After a discussion off the record, the court indicated its understanding that the parties agreed to submit the matter to it based upon the exhibit and the written arguments already submitted. The State indicated that this "is a review of whether or not the issuing Magistrate had substantial basis on which to find probable cause. I don't see any need to argue any further. The State believes that there is more than sufficient evidence contained in the affidavit for the Court to find probable cause."

{¶ 25} The April 1, 2015 affidavit of Detective Gerrald Mitchell provides as follows:

* * * Detective Gerrald Mitchell, Jr. of the Springfield Police Division, who being duly sworn according to law, deposes and says that on the 1st of April, 2015, Hotel Room 623 at the Courtyard by Marriott located as 100 S. Fountain Ave., Springfield, Clark County, Ohio, does contain certain evidence of criminal acts, to wit: Heroin, cocaine, marihuana, controlled substance analogs, drug paraphernalia, items used to transport, package, or prepare drugs for sale, money, financial records of drug trafficking activity, items showing an ownership or possessory interest in the residence and any items located therein, instrumentalities and proceeds of drug trafficking, firearms, cellular telephones (contact lists, text messages, call history, photographs, videos, application data, location data, and other documents and data) and any other evidence of trafficking or possession of

drugs in violation of sections 2925.03 and 2925.11 of the Ohio Revised Code and Affiant further says that he believes, and has good cause to believe, that such things are concealed at the above described location.

The facts upon which Affiant bases said belief are:

1. Affiant, Detective Gerrald Mitchell Jr., is employed by the City of Springfield Police Division and has been so since January of 2007. I have been assigned to the Springfield Police Intelligence Unit from May 2012 to the present date. I have a Bachelor of Science Degree in Criminal Justice Leadership from Urbana University. I have successfully completed the Drug Enforcement Administration's Basic Narcotics Investigator course. I have also received training to forensically extract data from mobile devices. My certifications include Cellebrite Certified Logical Operator and Cellebrite Certified Physical Analyst.

2. The Springfield Police Division has been investigating Andre Terrell (DOB 7/17/1978; * * *) for trafficking in drugs over the past several years.

3. In 1998, Terrell was sentenced to 3 years in prison in Clark County Case 98-CR-0477 for possession of drugs (crack). In 2003, he was convicted of possession of cocaine and sentenced to 3 years community control. In 2004, he was convicted of trafficking in drugs and again sentenced to 2 years of community control.

4. In July 2014, Sgt. Bennett and I met with a confidential source (CS #1261). CS # 1261 has provided information in the past about drug

traffickers which has led to the issuance of a search warrant, seizure of significant amounts of illegal drugs, and convictions. CS #1261 stated that Terrell was still currently selling illegal drugs in the Springfield area, including cocaine, and provided a current phone number for Terrell.

5. I also spoke to a confidential source (CS #1251). CS #1251 in the past has provided information that Terrell sells cocaine and heroin.

6. Within the past month, CS #1251 told me that Terrell was still currently selling heroin.

7. In February 2015, I contacted CS #1261 and CS #1251 to ask for any current phone numbers for Terrell. CS #1251 provided the same phone number CS #1261 had previously provided in July of 2014, as well as a second, new number. CS #1261 provided me with the same second, newer number as CS #1251.

8. On April 1, 2015 at approximately 2:30 AM, Officers Tyler McCarty and Jerod Osborne of the Springfield Police Division were dispatched to the Marriott Hotel at 100 S. Fountain Ave., Springfield, Clark County, Ohio, on report of two men in a white van in the parking lot, one of whom had been recently staying in the hotel, and he was seen regularly going from the hotel back out to the car. The caller also stated that they believed there to be drug activity going on based on what they were observing.

9. Officers arrived on scene shortly after being dispatched and approached a White Dodge Minivan with Illinois Plate P42-1003. The

passenger, later identified as Aaron Minter, was getting out of the vehicle as Officer Osborne arrived. Officer Osborne quickly approached the vehicle and noticed the odor of raw and burnt marijuana. Officer McCarty then arrived as the driver, later identified as Andre Terrell was exiting the vehicle and shut the driver's door. Terrell immediately stated that he was a guest at the hotel, and pointed to a security guard, stating, "He's seen me here for the past few nights he can tell you."

10. Officer McCarty asked Terrell if he had a key, which Terrell showed to him. The key said "Marriott" on it. He then handed the key back to Terrell. Officer McCarty asked which room Terrell was in and he stated "615." Officer Osborne indicated that he was going to search the vehicle based upon the plain smell of marijuana giving probable cause to search the vehicle. Officer McCarty asked Terrell if he could check if Terrell had anything illegal on him, he said he did not care. Officer McCarty asked if he could actually go into Terrell's pockets, again he said he did not care. Officer McCarty located in his left pants pocket a cylindrical shaped M&Ms container which contained a small bag of marijuana. In his right watch pocket he found a plastic bag containing what he thought may be methamphetamine. Terrell was placed into handcuffs at that time. Officer McCarty also located a notebook in his pocket, discussed below, which contained a ledger. Terrell was also in possession of two cellular telephones.

11. Later, the suspected methamphetamine was field tested, and

the field test indicated the presence of either amphetamine or analogs of MDM (ecstasy).

12.   Inside the vehicle, Officer Osborne located another box containing additional M&Ms containers with marijuana inside.   At that time, Minter was also placed in handcuffs and placed in a police vehicle.   Officer McCarty made contact with hotel staff and was advised that Terrell was actually staying in Room 623, and the room was currently booked in his name.   Officer McCarty contacted me at that time for advice on how to proceed.

13.   Officers then returned to speak to Terrell and Officer Osborne advised him of his rights.   Terrell was again asked what room he was in, and he again said 615.   Officer Osborne then asked for consent to search the room, and Terrell then said that he was actually not staying there, but was supposed to meet some girl who has a room there, but she hadn't shown up yet.   When asked, Terrell stated he did not know the female's name, or how to get ahold of her. He then stated he did not have a room at the hotel, but that he previously was staying in Room 615.

14.   The hotel provided me with copies of the invoices for Terrell's current and recent stays at the hotel.   The records showed that Terrell stayed at the Courtyard by Marriott, 100 S. Fountain Ave., checking in at 8:12 PM on March 25, and checking out at 1:20 PM on March 26, staying in Room 615. He then checked in again on March 31, 2015 at 10:32 PM, this time staying in Room 623.

15. I arrived on scene at approximately 4:00 AM. Officers showed me what they had found on Terrell's person and I conducted the above mentioned field test. I located in Terrell's wallet a key card for a Marriott hotel; however, hotel staff indicated that the key was not for the hotel at 100 S. Fountain Ave. Officer McCarty also indicated that the key I found in the wallet was not the key that Terrell had shown him earlier. I also located in Terrell's belongings the ledger that Officer McCarty had located in Terrell's pocket, with listed names of known drug traffickers in Springfield, with different numbers, presumably dollar amounts listed next to their names, and with several lines crossed out, and the same name appearing multiple times. A photograph of a page of the ledger is attached hereto as Exhibit A. Of note are the lines reading "Juve 1000," multiple lines with the name "Ills," "Tylic – 290," "Dew 1500", "Sam". "Juve" is a known nickname for Jerrell Fleming, who is known to me to be a drug trafficker in Springfield. "Ills" is a known nickname for Aaron Minter, the passenger in the vehicle with Terrell. "Tylic" is likely to be Tilic Beal, also a known drug trafficker in Springfield. The numbers likely indicate dollar amounts possibly owed to Terrell for various types and amounts of illegal drugs.

16. I then searched the van in which Terrell and Minter were located. My goal was to located [sic] the room key that Terrell had shown Officer McCarty. I located some empty plastic bags in different places inside the van. I also located a box of freezer bags sitting on top of one of the seats in the rear of the van. Under the dashboard area, I saw three

coffee cups wrapped in plastic like the kind commonly found in hotel rooms. In the far rear storage area of the van, there were multiple plastic grocery bags, and approximately 12-15 tennis balls. Most [of] the tennis balls had holes cut into the hollow interior, and at least one was cut further open. I opened up the tennis balls and found nothing inside them. I located nothing else inside the van that could explain why the tennis balls were present; however, I do believe that they could be a unique method of covertly transporting illegal drugs. I did not locate the Marriott key card that Terrell showed Officer McCarty. The key card was not found on Terrell's person or in his belongings.

17. The security guard at the hotel provided further information. He stated that the "large male," referring to Aaron Minter, had arrived in the vehicle which was currently parked next to the van. That vehicle is registered to another person with the last name Minter. He stated that on March 25, the same evening as Terrell's previous stay at the hotel, he observed suspicious behavior by Terrell in the parking lot of the hotel. He observed Terrell meet with a Blue Tahoe in the parking lot, and Terrell and the Blue Tahoe would repeatedly leave and return after about 20-30 minutes, go up to the room, and also would sit in the vehicles in the parking lot for periods of time. Due to his suspicions, the security guard drove through the parking lot a few times, upon which Terrell approached him on foot and said "So you know I'm a guest here, in case you were going to call the cops."

18. The security guard described similar behavior on the night of March 31, again involving the same Blue Tahoe, as well as Aaron Minter and his vehicle. Again they went up to the room, then they would leave for 30 minutes and come back, multiple times, and sit for around 20-30 minutes in the vehicles in the parking lot at night. This suspicious behavior led the security guard to believe drug activity was occurring, which led him to contact law enforcement.

19. Based upon all of the foregoing, including Terrell's attempt to conceal that he had a hotel room, his inconsistent answers regarding the hotel room, his apparent attempt to hide or get rid of the key to Hotel Room 623, the observations of the security guard at the hotel, the ledger in Terrell's pocket, and all of my training and experience, I believe it is highly likely that Hotel Room 623 at the Marriott at 100 S. Fountain Ave., Springfield, Clark County, Ohio, will contain illegal narcotics and other evidence and proceeds of trafficking in drugs by Andre Terrell.

20. The following assertions are all based upon affiant and other detectives of the drug unit's training and experience:

  • drug traffickers commonly use multiple cellular telephones to communicate with buyers and sellers of narcotics via text messaging and telephone calls, and said cellular telephones will often contain evidence of drug trafficking such as text messages, telephone calls, photographs, call history, application data, and other electronic documents;

• narcotics traffickers typically maintain on hand large amounts of U.S. currency in order to maintain and finance their ongoing narcotics business;

• narcotics traffickers maintain books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, sale and distribution of controlled substances;

• drug traffickers commonly have in their possession, firearms used to protect and secure their property, narcotics, and money.

Said Affiant further says that on or about April 1, 2015 Hotel Room 623 at the Courtyard by Marriott located at 100 S. Fountain Ave., Springfield, Clark County, Ohio, does possess and conceal said things, or some part thereof, at the place described above, then and there well knowing the same violates section 2925.03 and 2925.11 of the Ohio Revised Code as aforesaid.

{¶ 26} In overruling the portion of Terrell's motion addressed to the search warrant, the court indicated as follows:

The Court finds that the affidavit accompanying the aforementioned warrant contains sufficient indicia of probable cause to pass muster under the Fourth Amendment to the United States Constitution.

Upon being presented with the information contained in the affidavit, a reasonably prudent person would believe that there is a fair probability that the place to be searched contained evidence of a crime. Therefore, the Court concludes that the issuing judge had a substantial basis for

concluding that probable cause existed.

{¶ 27} We note that on May 6, 2016, in his "Request to File Transcript," Terrell requested the transcripts of the two-day jury trial and of disposition. On July 8, 2016, the transcript from the November 9, 2015 suppression hearing was filed. On July 13, 2016, the video deposition of Megan Snyder and the deposition transcript were filed, along with the trial transcript. On July 27, 2016, Terrell filed a "Motion for Extension of Time Within Which to File Appellant's Brief," asserting that "an extension is necessary due to the voluminous nature of the transcript; the need to supplement the record with exhibits and suppression transcripts; and counsel will need sufficient time to review all of the transcripts, and finalize Appellant's Merit Brief." Appellant's brief was filed on September 1, 2016, pursuant to this Court's order, and no request to supplement the record was received from Terrell.

{¶ 28} Terrell asserts four assignments of error herein. His first assignment of error is as follows:

THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS WHEN THE AFFIDAVIT IN SUPPORT OF THE SEARCH WARRANT WAS FACIALLY DEFICIENT, OVERBROAD, AND LACKED PROBABLE CAUSE.

{¶ 29} Terrell asserts that the "issuing judge improperly considered stale evidence provided by Confidential Informants ('CS') in ruling that the search warrant contained sufficient probable cause. Further, the dated prior convictions of Appellant listed in the affidavit are stale and add no value to a probable cause determination." Terrell asserts that specifically, "paragraphs four through seven of Detective Mitchell's affidavit contain

stale information obtained from confidential sources." He asserts that the "affidavit also fails to demonstrate any evidence that Appellant was engaged in a continuing course of criminal conduct."

{¶ 30} Terrell argues further that in "addition to being stale, the information provided by the confidential sources lacks any indicia of veracity, credibility, or basis of knowledge of the sources; and Detective Mitchell fails to demonstrate the sources['] reliability through averment or corroboration." According to Terrell, "statements from two confidential sources and an unidentified caller allegedly from the Marriott Hotel were included in the affidavit by Detective Mitchell. All three of these sources allege facts which implicate Appellant in a crime, so the basis of their knowledge of the crime is called into question." Terrell argues that the "statements lack any degree of detail, do not indicate that they are based on the first-hand knowledge or personal observation of the source, and lack reliability."

{¶ 31} Regarding CS #1251, Terrell argues that based "on the information in the affidavit, it is impossible to determine if the CS was relating their own personal knowledge, or passing on a rumor they heard on the street. The complete lack of detail or indication of personal observation fails to demonstrate the source[']s basis of knowledge, and precludes a finding [of] probable cause." Terrell asserts that the "affidavit contains no averment from the affiant as to the past reliability of CS #1251," and that the "affidavit also lacks police corroboration to potentially cure any defects in reliability," such as "the use of a controlled buy."

{¶ 32} Regarding CS #1261, Terrell asserts that the information provided by him or her "is as devoid of specifics or indications of the source's basis of such knowledge as

that provided by CS #1251, but the affidavit does contain an averment to the reliability of CS #1261." According to Terrell, however, "even where an affiant specifically avers to the past reliability of a source, probable cause may not be found where an affidavit contains no factual basis for a source's knowledge."

{¶ 33} Terrell asserts that *State v. Dalpiaz,* 151 Ohio App.3d 257, 2002-Ohio-7346, 783 N.E.2d 976 (11th Dist.), is "strikingly similar" to the matter herein. He asserts as follows:

> The affidavit in the case at bar includes information from sources of even more doubtful reliability, and provides significantly less specific information than the informant in *Dalpiaz.* The affiant states that the Springfield Police Division has been investigating Appellant for trafficking in drugs for several years. *Affidavit,* ¶ 2. Assuming this statement is true, the most significant piece of evidence obtained by the Springfield Police over a several year investigation is apparently that two confidential informants provided the same alleged phone number for Appellant. Considering many lawful citizens who are not drug traffickers have phone numbers, that two sources provided the same phone number for Appellant is useless in demonstrating probable cause for the issuance of a search warrant; even if the Springfield Police had verified that the number the sources provided actually was Appellant's.

{¶ 34} Terrell next argues that "Detective Mitchell intentionally, or with conscious indifference, presents several of his own inferences as empirical fact in the affidavit," namely "when he stated that the words in a notebook found in Appellant's pocket were

the nicknames of specific individuals, that those individuals were known drug traffickers, and that those drug traffickers were located in Springfield." Terrell argues that Mitchell's conclusion "that the numbers in the notebook indicate money specific individuals owed to Appellant for the sale of illegal drugs * * * involves an extremely complex and attenuated logical leap." Terrell asserts that "testimony given at trial indicates Detective Mitchell's inclusion of undisclosed inferences as empirical fact in the affidavit were acts of malfeasance or misfeasance." Terrell argues that "Beau Collins, a Detective with the Springfield drug unit since April, 2009, stated that he believes that the nickname Juve is associated with a man named Jermaine Fleming, and Jerrell Fleming goes by the nickname 'senior'. *Trial Transcript*, page 351, lines 18-19."

{¶ 35} Terrell argues that "Detective Mitchell attached one page of the notebook to his affidavit, but omitted two others." He asserts that the "existence of these pages is never mentioned in the affidavit, nor were they submitted to the magistrate." Terrell concludes that the "omission of these pages, along with Detective Mitchell's undisclosed inferences, deprived the magistrate of the opportunity to independently review the evidence and form his own inferences based upon the totality of the circumstances."

{¶ 36} Terrell next asserts that the "affidavit in support of the search warrant submitted by Detective Mitchell contains no information indicating that Room 623 was being used by Appellant for drug trafficking." Terrell asserts that the matter herein is "strikingly similar" to *State v. Perez*, 2015-Ohio-1753, 32 N.E.3d 1010 (2d Dist.). Terrell argues that therein "this Court held that an individual's possession of a significant quantity of drugs or other evidence of drug trafficking does not establish probable cause to search their home without some additional evidentiary link." Terrell asserts as follows:

* * * Unlike the defendant in *Perez*, Appellant was not found with any large amount of drugs; no evidence of an investigation of Appellant at any other location is included; no reliable informant provided any specific information about illegal items in Appellant's possession, the affidavit does not indicate that any unusually large amount of cash was found on Appellant when he was searched outside his van; and the affidavit does not even allege that anyone witnessed Appellant actually selling drugs.

The sole evidence of Appellant's actual activity inside the hotel is that a security guard saw Appellant enter and exit the hotel a number of times; and sit around in his vehicle for 20-30 minutes at a time, sometimes with a guest. * * * Observed conduct that is consistent with innocent as well as criminal activity creates, at best, a suspicion of illegal activity, and is not sufficient to establish probable cause.

{¶ 37} Finally, Terrell asserts that the good faith exception to the exclusionary rule does not apply herein. He argues that the "sheer number of deficiencies and the overt lack of probable cause make it clear that no reasonable police officer acting in good faith could have relied on the warrant."

{¶ 38} The State responds that "the search warrant explains the ongoing drug unit investigation that relate[s] to Appellant and his history of drug related activity. This historical information is provided to explain why Appellant's activity observed on the evening in question shows that he was engaging in drug trafficking and not simply going to his car to smoke." The State argues that the "historical information about Appellant's drug activity is provided to give context to the action observed on the evening in question."

The State relies upon the testimony of the security guard at the suppression hearing of October 2, 2015.

{¶ 39} Regarding the confidential informants, the State asserts that "as to CS #1261, the affidavit does include information related to the reliability of that source in paragraph #4. The information from CS #1251 is used to corroborate the information provided from CS #1261 and show the pattern of Appellant's conduct related to drug trafficking." The State asserts that the "information from the confidential informants is not used in the affidavit to show that he was trafficking in drugs on March 31, 2015 in particular and therefore there is nothing in the record to suggest that the court improperly considered the historical evidence from the confidential informants."

{¶ 40} The State further argues that Mitchell's assertion in the affidavit that the ledger retrieved from Terrell contained information about known drug dealers "is not an inappropriate inference to be made by a drug unit detective familiar with the known drug dealers in Springfield." According to the State, "this Court cannot consider testimony from trial when reviewing suppression rulings."

{¶ 41} The State asserts that the matter herein is distinct from *Perez*, and that the "evidence presented to the judge in the search warrant does provide a sufficient nexus between Appellant's trafficking activity and the hotel room." The State asserts that "certainly the officers executing the search warrant in this case acted in good faith as they were conducting a search pursuant to a search warrant signed by a judge."

{¶ 42} In Reply, Terrell asserts that the "state cannot create a continuing course of conduct by arguing that, because Appellant was convicted of a drug offense eleven years ago, he must still be involved in drug trafficking." He asserts that his prior conviction

does not support the warrant. He asserts that "the only information, other than a phone number allegedly belonging to Appellant, provided by CS #1261 was provided in July, 2014. The State fails to address the staleness of this information, and then argues that unreliable information corroborates stale information."

**{¶ 43}** Terrell asserts as follows:

* * * The affidavit allows a search of Appellant's hotel room for evidence of drug trafficking, specifically including cocaine and heroin. The sole reference to either cocaine or heroin included in the affidavit stems from the statements of Confidential Sources. It is axiomatic that an affidavit could not demonstrate probable cause to search for evidence of a crime that the affidavit makes literally no reference to. Considering there is no basis upon which the issuing magistrate could have relied in issuing a search warrant for cocaine and heroin; it is clear that, contrary to the assertion of the State, this historical information was improperly considered by the court.

The state has admitted that the Confidential Source information was not even intended to demonstrate that Appellant was trafficking in drugs on the night in question. The State cannot show a sufficient nexus between the alleged crimes of possession of cocaine and heroin, and the hotel room in question, where the State admits that the only information in the affidavit even referencing cocaine or heroin does not create, and was never intended to create, such a nexus.

**{¶ 44}** Terrell asserts that "Detective Mitchell included undisclosed inferences

regarding his conclusions that the words in a ledger found on Appellant were nicknames of specific people" who were known drug dealers, and that the "State's sole argument in response is that Detective Mitchell's inference regarding allegedly known nicknames was not an inappropriate inference." Terrell further argues that none of the pages of the ledger "contain any overt references to narcotics, and none of them include dollar signs or any other representation that the numerals are actual dollar amounts." He asserts that the inclusion of "only the page of notebook that supports his undisclosed inference highlights his overt, and apparently successful, attempt to preclude the issuing magistrate from making his determination based upon a full and fair review of the totality of the circumstances."

{¶ 45} Terrell asserts that "there is absolutely no evidence connecting actual drug activity to Appellant's hotel room." He asserts that there "was no large amount of cash or drugs found on Appellant, in his vehicle, on Mr. Minter, or in Mr. Minter's vehicle; yet the State claims the perfectly legal activity of walking in and out of a hotel multiple times demonstrates a sufficient nexus to connect Appellant and his hotel room to drug trafficking." Terrell asserts that the good faith exception to the exclusionary rule should not be applied.

{¶ 46} The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Crim.R. 41(C)(2) provides in part that the "finding of probable cause may be based upon hearsay in whole or in part, provided there is a substantial basis for believing the source of the hearsay to be credible and for believing that there is a factual basis for the information furnished."

{¶ 47}  As noted by the Supreme Court of Ohio, in *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, ¶ 34:

> Central to the Fourth Amendment is the probable cause requirement. While a probable cause determination for an arrest warrant is similar in nature to that for a search warrant, a search warrant inquiry is much more complex and presents special considerations.  2 LaFave, *Search and Seizure*, Section 3.1(b)(5th Ed. 2012).  Special considerations to be taken into account when determining whether to issue a search warrant include how stale the information relied upon is, when the facts relied upon occurred, and whether there is a nexus between the alleged crime, the objects to be seized, and the place to be searched.  *Id.*, Section 3.7(a),(b), and (d).

{¶ 48} As this Court has previously determined:

> "In determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' "  *State v. George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1989), paragraph one of the syllabus, quoting *Illinois v. Gates*, 462 U.S. 213, 238-239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

> "In reviewing the sufficiency of probable cause in an affidavit

submitted in support of a search warrant issued by a magistrate, neither a trial court nor an appellate court should substitute its judgment for that of the magistrate by conducting a de novo determination as to whether the affidavit contains sufficient probable cause upon which that court would issue the search warrant." *Id.* at paragraph two of the syllabus. "Rather, the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." *Id.* *State v. Terrell*, 2d Dist. Clark No. 2011-CA-57, 2013-Ohio-124, ¶ 8-9.

{¶ 49} "Probable cause determinations are limited to the four corners of the underlying affidavit." *State v. Hale*, 2d Dist. Montgomery No. 23582, 2010-Ohio-2389, ¶ 20.

{¶ 50} We conclude that, viewing the totality of the circumstances, the affidavit in support of the search warrant herein provided adequate probable cause for the issuance of the warrant. Regarding Terrell's assertion that his prior convictions constitute stale information, we conclude that they provide background and context for the officers' ongoing involvement in investigating Terrell, and bear some relevancy to Terrell's conduct that night.

{¶ 51} Regarding paragraphs four through seven of the affidavit, we note that Mitchell attested to the veracity of CS #1261, noting that he or she "has provided

information in the past about drug traffickers which has led to the issuance of a search warrant, seizure of significant amounts of illegal drugs, and convictions." While Terrell asserts that the information regarding his phone numbers is stale, in February 2015, CS # 1251 corroborated the phone number provided by CS #1261 in July 2014, as well as an additional number that matched the second number also provided by CS #1261. Both informants advised that Terrell was selling illegal drugs.

{¶ 52} Most significantly, Terrell ignores the events of the night of his arrest. Officers McCarty and Osborne were dispatched to the hotel on a report of suspected drug activity. Upon Osborne's approach of Terrell's vehicle, he smelled marijuana, and he retrieved marijuana and what he believed to be methamphetamine from Terrell's person. Mitchell also located a ledger, the contents of which, in his experience, were consistent with drug trafficking, namely the names of known drug dealers next to what Mitchell believed were dollar amounts representing money owed to Terrell for drugs. Corroborative of the information provided by the confidential sources, Terrell was also in possession of two cell phones. Additional marijuana was found inside Terrell's vehicle. Terrell initially stated that he was staying in Room 615, then stated that did not have a room at the hotel but was there to meet "some girl" whose name he did not know. Mitchell subsequently learned that Terrell was registered at Room 623, having previously stayed at the hotel in Room 615 five days earlier. The security guard advised Mitchell that he had personally observed Terrell engage in suspicious behavior that he believed was drug activity in the hotel parking lot on March 26, 2015, and similar behavior on the night of March 31, 2015. The guard advised Mitchell that Terrell and Minter on both occasions "went up to the room, then would leave for 30 minutes and come back, multiple

times, and sit for around 20-30 minutes in the vehicles in the parking lot at night."

{¶ 53} In *Dalpiaz,* the police had evidence that Dalpiaz was cultivating marijuana. *Id.,* ¶ 28. As the Eleventh District noted:

The affidavit attached to the July 7 warrant contains the following statements concerning [Chief Detective] Doak's sources of information: "[t]he affiant has received information that [appellant] makes frequent trips both in the morning and evening hours * * *"; "[appellant] has been seen making these trips * * *"; "[appellant] is commonly known to carry a firearm on his side during these trips * * *"; "[a]ccording to confidential sources, this individual has not worked * * * for several years"; "[t]he Portage County Sheriff's Office has received information that the cultivation of marijuana is [appellant's] only source of income"; and "[w]e have received information in the past and currently know that [appellant] is known to booby trap the areas where he cultivates marijuana." Nowhere does the affidavit suggest that this information was received from reliable sources. In fact, much of the information provided in the affidavit is not even attributed to a particular source or to particular sources.

In view of the complete absence of any indication of the reliability of the sources that provided Doak with the information concerning appellant's activities outlined in the affidavit, the affidavit failed to establish probable cause for the issuance of the search warrant, and appellant's third assignment of error is well taken.

*Id.,* ¶ 36-37.

{¶ 54} We cannot conclude, as does Terrell, that the affidavit herein is "strikingly similar" to that in *Dalpiaz.* The information in Mitchell's affidavit is attributed to two specific confidential sources, the observations of the security guard on March 26 and 31, and the observations of McCarty, Osborne and Mitchell, who interacted with Terrell.

{¶ 55} Regarding Terrell's assertion that Mitchell presented his own inferences as empirical fact, we disagree. Mitchell has been employed by the City of Springfield Police Division since January 2007, and he has been trained in narcotics enforcement. Mitchell's averments, in paragraph 15 of the affidavit, regarding the known nicknames of Minter and of specific drug traffickers in Springfield, are based on Mitchell's personal knowledge. Further, based upon his experience, it is a reasonable inference that the numbers in the ledger alongside the nicknames "likely indicate dollar amounts owed to Terrell for various types and amounts of illegal drugs."

{¶ 56} The distinction between the matter herein and *Castagnola* is instructive. Castagnola admitted in a text message to "Source May" that he damaged the vehicles of David Maistros, a prosecutor. *Id.*, ¶ 3. The text message indicated that Castagnola " '[f]ound his address and went to his house * * *.' " *Id.*, ¶ 6. The affidavit provided to obtain the search warrant paraphrased the exchange between Castagnola and "Source May" in part as follows: "Castagnola then says that he found Maistros online in the clerk of courts because he [Maistros] got a parking ticket several years ago." *Id.*, ¶ 8. "The detective did not state in the search-warrant affidavit the internet-access capability or other capabilities of Castagnola's cell phone." *Id.*, ¶ 9. "Nor did the search-warrant affidavit provide information, beyond the 'online' inference, to indicate that Castagnola had conducted an online search for Maistros's address or that a computer that was used

to conduct such a search was located in Castagnola's residence." *Id.* Upon execution of the warrant, child pornography was found on one of Castagnola's computers. *Id.*, ¶ 13.

{¶ 57} The Supreme Court of Ohio determined in part as follows:

> In short, while there was probable cause to believe that Castagnola had searched for [the prosecutor's] address, the method of his search was not clear. We affirmatively reject the trial court's assertion that in determining whether an affidavit supports probable cause to issue a search warrant, a magistrate can infer "online" activities by people of a certain age. We further reject the trial court's supposition that statements sent by text message admitting criminal activity create a substantial basis for concluding that evidence of a crime will be found on a computer. Similarly, we are not inclined to leap to the conclusion that the information stored on a phone will necessarily be backed up on a computer. Although we are in the computer age, records of court activity still exist in paper form and are available to the public in clerk of courts' offices around the state.

*Id.*, ¶ 63. The *Castagnola* Court determined that "the affiant negligently usurped the inference-drawing authority of the magistrate and * * * under the totality of the circumstances, the search warrant was not supported by probable cause." *Id.*, ¶ 65.

{¶ 58} Herein, Mitchell's averments are based on his personal knowledge of the identities of the nicknames of Minter and the drug traffickers, and his inference regarding the purpose of the ledger, containing names and numbers, is not attenuated, as the inference in *Castagnola*, but rather is reasonable based upon Mitchell's experience.

Finally, we note that Mitchell attached the page of the ledger to the affidavit that he believed to be relevant to his investigation, again based upon his experience.

{¶ 59} We agree with the State that Terrell's reliance upon the testimony of Beau Collins in the trial transcript to attempt to discredit Mitchell's reasonable inferences is misplaced. In *State v. Harris*, 2d Dist. Montgomery No. 26810, 2016-Ohio-7097, ¶ 3, this Court emphasized that "when reviewing suppression rulings, we consider only the evidence before the trial court at the suppression hearing; we cannot consider any additional evidence presented at a subsequent trial."

{¶ 60} Regarding Terrell's assertion that the affidavit lacked a nexus between the drugs found on his person and in his hotel room, we disagree. In *Perez*, upon which Terrell relies, this Court noted as follows:

> The affidavit in support of the June 27 warrant indicates that Perez was involved in drug trafficking and that evidence of that trafficking was located in his home. He also used his truck to conduct drug transactions away from his home. Upon the search of Perez's truck and subsequent investigation, police discovered that Perez recently rented a storage unit at the Stop-N-Lock on Linden Avenue. Based on this information, a reasonable police officer might suspect that the previously-seen, but not yet located weapons and additional evidence of drug trafficking might be found in the storage unit. However, a reasonable belief, without some evidentiary support, is not enough for a search warrant.

*Id.*, ¶ 19.

{¶ 61} Unlike in *Perez*, we conclude that there is sufficient evidentiary support of a

nexus between the alleged crime of drug trafficking, the objects to be seized, and Room 623. As noted above, Terrell was the subject of a drug trafficking investigation, and the security guard reported activity consistent with drug trafficking to Mitchell occurring on two occasions, namely March 25 and the night of Terrell's arrest. It was reasonable to infer that in the course of his comings and goings, as described by the security guard, Terrell transported drugs to purchasers. While the amount of drugs retrieved from Terrell was not large, his ledger and his possession of more than one cell phone suggest an ongoing drug trafficking activity. His evasive answers about his room further suggest the potential presence of contraband that he sought to conceal. Finally, Mitchell confirmed that Terrell was the registered guest of Room 623 on the night of his arrest, and the registered guest of Room 615 on March 25.

**{¶ 62}** For the foregoing reasons, and deferring to the magistrate's determination of probable cause, we conclude that the facts in the affidavit provided a substantial basis for finding probable cause to believe that drugs likely were present in Room 623. Accordingly, we need not address Terrell's assertion regarding the good faith exception. Terrell's first assignment of error is overruled.

**{¶ 63}** Terrell's second assignment of error is as follows:

THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS WHEN THE WARRANT WAS SO LACKING IN PARTICULARITY AS TO BE FACIALLY DEFICIENT, AND THE EXECUTING OFFICERS FLAGRANTLY DISREGARDED THE LIMITATIONS THE WARRANT DID CONTAIN.

**{¶ 64}** Terrell asserts that the warrant lacks particularity, and that our standard of

review is de novo. Terrell notes that "specifically the warrant states that the police should seize, items showing an ownership or possessory interest in the residence and any items located therein." He further argues that the "warrant states that the contents of cell phones subject to seizure include 'contact lists, text messages, call history, photographs, videos, application data, location data, and other documents and data.' " According to Terrell, "the warrant gave the officers carte blanche to seize whatever they might think incriminating or useful to them." Terrell directs our attention to the trial testimony of Detective Scott Curnutte, whose "statement that he was searching for anything that might be interesting explicitly shows that the officers executing the search warrant were in no way limited by the express terms in the warrant, and that he arrived at Room 623 with the intent to participate in the type of 'general rummaging' and exploratory search expressly prohibited by the Fourth Amendment."

{¶ 65} Finally, again citing the trial transcript, Terrell asserts that the "officers executing the search warrant seized a candle warmer, a coffee cup, a bottle of Patron tequila, the box the bottle of Patron came in, several glasses, empty Kroger shopping bags, and wrist watch * * *. None of these items have any possible relation to drug trafficking."

{¶ 66} Regarding the particularity of the warrant, as noted in *Castagnola*:

Courts addressing the particularity requirement of the Fourth Amendment are concerned with two issues. The first issue is whether the warrant provides sufficient information to "guide and control" the judgment of the executing officers in what to seize. *United States v. Upham*, 168 F.3d 532, 535 (1st Cir.1999). The second issue is whether the category as

specified is too broad in that it includes items that should not be seized. *See*

*United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995).

*Id.*, at 79. "Catchall provisions of warrants also ' "must be read in conjunction with the list of particularly described items which preceded it pertaining to the crimes alleged." * * * ' ". *State v. Hale*, 2d Dist. Montgomery No. 23582, 2010-Ohio-2389, ¶ 43 (citation omitted) .

**{¶ 67}** We note that Terrell did not raise the particularity of the warrant or the scope of the search before the trial court.   The only issue before the trial court at the hearing on November 9, 2015, and the only issue the court addressed, was whether there was sufficient probable cause to support the issuance of the warrant. We conclude that Terrell waived all but plain error as to the issues that he now asserts by failing to raise them in the trial court.   *State v. Zwick,* 2d Dist. Miami No. 2013 CA 4, 2014-Ohio-230, ¶ 18. ("In his motion to suppress, Zwick challenged the issuance of the search warrants, not whether the seizure of items pursuant to the warrants exceeded the scope of the warrants. Because Zwick failed to raise the scope of the warrants in the trial court, he has waived all but plain error on that issue.")

**{¶ 68}**  The portions of the warrant referring to the contents of cell phones and "any" items located in Terrell's hotel room must be read in conjunction with the list of particularly described items before them in the warrant.   When the listed items, namely "[h]eroin, cocaine, marijuana, controlled substance analogs, drug paraphernalia, items used to transport, package, or prepare drugs for sale, money, financial records of drug trafficking activity,* * *" are properly read in conjunction with the broader, "catchall" provisions regarding the hotel room and the phones, plain error is not demonstrated.

{¶ 69} Regarding the non-contraband items listed above seized in the course of the search, there was no evidence before the trial court regarding any items seized. As noted above, in addressing the trial court's decision on the motion to suppress, we will not consider the testimony adduced at trial. Plain error is not demonstrated, and for the foregoing reasons, Terrell's second assignment of error is overruled.

{¶ 70} Terrell's third assignment of error is as follows:

THE TRIAL COURT ERRED WHEN IT OVERRULED THE MOTION TO SUPPRESS, BECAUSE THE OFFICER PAT SEARCHED [sic] APPELLANT ABSENT A REASONABLE SUSPICION THAT HE POSSESSED A WEAPON, AND ANY CONSENT WAS GIVEN INVOLUNTARILY.

{¶ 71} Terrell argues that "McCarty stated at trial that the search he conducted was not for weapons, Appellant had given him no reason to believe he had a weapon, and that he was specifically looking for evidence of drugs." Terrell asserts that there is "some discrepancy in the record as to whether or not Officer McCarty searched Appellant before or after Officer Osborne indicated that he smelled marijuana from the vehicle; but in either case, Appellant's rights were violated."

{¶ 72} Terrell directs our attention to this Court's decision in *State v. Alexander*, 2d Dist. Montgomery No. 18205, 2000 WL 1062064 (Aug. 4, 2000). Therein, one officer approached a vehicle in a hotel parking lot at 11:30 p.m. *Id.*, *1. The officer smelled a strong odor of marijuana coming from the vehicle. *Id.* When the driver of the vehicle could not produce identification and exhibited "assertive movements," the officer decided to pat him down for officer safety. *Id.*, *2. This Court noted that smoking marijuana is not

"an especially serious offense," and that there was "nothing in the record to suggest that Alexander was a drug dealer." *Id.*, *3. The Court concluded that "the strong odor of marijuana, indicative of Alexander's use of marijuana, even if he was not buying or selling marijuana, justified Smith in conducting a limited pat-down search for weapons when he decided it was necessary to place Alexander in the back of his police cruiser to separate him from the other occupant of the car, while Alexander's identification was being verified." *Id.*, *4. Terrell asserts that "[u]nlike in *Alexander*, Officer McCarty expressly states that the search was not for weapons, and was done to locate drugs. There was no concern expressed regarding officer safety, and the 'close call' found in *Alexander* becomes an obvious violation in those circumstances."

{¶ 73} Alternatively, Terrell argues that if he "was not in custody and entitled to the protections of *Miranda* at the time of the search, then Appellant was unlawfully detained, and his consent was not freely or voluntarily given." According to Terrell, if "the search was made prior to Officer Osborne detecting the smell of marijuana, th[e]n Officer McCarty had absolutely no reason to search Appellant; and detaining a hotel guest for sitting in their vehicle outside the hotel would be asinine." Terrell argues that if he was searched after Osborne indicated that he intended to search the vehicle based upon the smell of marijuana, "then Appellant was already aware that a search of his vehicle was going to be performed without his consent, and without the officers even asking for his consent, so he would have no reason to think that refusing to allow Officer McCarty to search his person would actually have any effect whatsoever on whether the search was performed."

{¶ 74} Terrell asserts that the "State will likely argue that Appellant consented to

the search because he said, 'I don't care', in response to the search request. Appellant's statement was not an affirmative waiver of his constitutional rights, it was resignation based on his understanding that a search would be conducted no matter what he said." Terrell asserts as follows:

> * * * Appellant was apprehensive of elevating the confrontation with Officer McCarty, and believed refusing consent would only create a far more contentious atmosphere, and that Officer McCarty would search him anyway. After being read his rights, Appellant refused to consent to a search of his hotel room; but when Officer McCarty asked to search him, Appellant had not been read his rights, and didn't believe he had the ability to refuse, because no one had told him he could. Appellant did not willingly and voluntarily consent to a search, he resigned himself to the inevitable, and said that he did not care.

{¶ 75} The State responds that "when looking at the totality of the circumstances surrounding the consent it is clear that there was consent for the officers to search Appellant's person." According to the State, "Officer McCarty testified at the suppression hearing that he asked Appellant if he minded if Officer McCarty searched him and that Appellant responded that he didn't care." The State further asserts that "Officer McCarty also testified that he asked Appellant specifically if he could check inside his p[o]ckets and appellant again responded that he didn't care." The State argues that Terrell's "consent to search his person was heard by the hotel security officer who testified at the suppression hearing that Appellant consented to the search." According to the State, there "was no evidence presented at the suppression hearing to counter the consent

given," and officers "are not required to inform a subject that they can refuse to search for consent to be effective." The State notes that Terrell "had no problem" refusing consent to search his hotel room.

{¶ 76} In reply, Terrell argues as follows:

Appellant's arguments that he believed he could not refuse consent, and that he did not refuse out of fear, are not separate arguments, but two parts of a whole. At the time Officer McCarty requested to search Appellant, Officer Osborne had already indicated that Appellant's vehicle would be searched without his consent. Appellant had not been read his *Miranda* rights, knew that his vehicle was being searched without his consent, and; according to Officer McCarty, Appellant was being detained. * * * Under these circumstances, Appellant believed that if he did attempt to refuse consent, he would be searched anyway; and feared that any attempt to refuse would only result in creating a more confrontational situation with the officers.

{¶ 77} Terrell acknowledges that he refused consent to search his hotel room, but notes that "this was after Officer Osborne informed Appellant of his *Miranda* rights. Appellant's understanding that he could effectively and safely refuse to consent to a search of his hotel room was a direct byproduct [sic] of being informed through *Miranda* that his rights would be honored." According to Terrell, the State "may be correct that officers are not necessarily required to inform a suspect of his rights prior to a request for consent in all circumstances, but officers are certainly required to do so when a suspect is in custody, and Officer McCarty openly admits that Appellant was being detained."

Finally, Terrell notes that "Officer McCarty admits that Appellant's statement that he did not care was not an affirmative yes."

{¶ 78} As this Court has previously noted:

"Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Koon*, 2d Dist. Montgomery No. 26296, 2015-Ohio-1326, ¶ 13 quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.* The application of the law to the trial court's findings of fact is subject to a de novo standard of review. *State v. Gordon*, 5th Dist. Fairfield No. 14–CA–13, 2014-Ohio-5027, ¶ 14, citing *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

*State v. Turner*, 2015-Ohio-4612, 48 N.E.3d 981, ¶ 10 (2d Dist.).

{¶ 79} "In general, '[l]aw enforcement may briefly stop and detain an individual for investigation if the officers have a reasonable, articulable suspicion that criminal activity may be afoot.' *State v. Studley*, 2d Dist. Greene No. 2010 CA 81, 2011-Ohio-5563, ¶ 54, citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)." *State v.*

*White*, 2013-Ohio-3027, 995 N.E.2d 930, ¶ 15 (2d Dist.).

**{¶ 80}** As this Court has previously noted:

Consent is an exception to the warrant requirement that requires the State to "show by 'clear and positive' evidence that the consent was 'freely and voluntarily' given." (Citations omitted.) *State v. Posey*, 40 Ohio St.3d 420, 427, 534 N.E.2d 61 (1988). Specifically, " ' "the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." ' " (Emphasis omitted.) *State v. Hawkins*, 2d Dist. Montgomery No. 25712, 2013-Ohio-5458, ¶ 14, quoting *State v. Robinette*, 80 Ohio St.3d 234, 243, 685 N.E.2d 762 (1997), quoting *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

"A 'clear and positive' standard is not significantly different from the 'clear and convincing' standard of evidence, which is the amount of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations to be proved. It is an intermediate standard of proof, being more than a preponderance of the evidence and less than evidence beyond a reasonable doubt." (Citations omitted). *State v. Ingram*, 82 Ohio App.3d 341, 346, 612 N.E.2d 454 (2d Dist.1992). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

*State v. Ojezua*, 2016-Ohio-2659, 50 N.E.3d 14, ¶ 17-18 (2d Dist.).

**{¶ 81}** As this Court noted in *State v. Sears*, 2d Dist. Montgomery No. 20849, 2005-Ohio-3880, ¶ 37:

> * * * Knowledge of the right to refuse consent is not a prerequisite to establishing voluntary consent, but is a relevant factor to be taken into account. Consent to a search that is obtained by threats or force, or granted only in submission to a claim of lawful authority, is invalid. *Id.* Such "lawful authority" is an express or implied false claim by police that they can immediately proceed to make the search in any event. *Bumper v. North Carolina* [391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).]

**{¶ 82}** Six factors courts consider in determining the voluntariness of consent include:

> 1) whether the defendant's custodial status was voluntary;
>
> 2) whether coercive police procedures were used;
>
> 3) the extent and level of the defendant's cooperation;
>
> 4) the defendant's awareness of his or her right to refuse consent;
>
> 5) the defendant's education and intelligence;
>
> 6) the defendant's belief that no incriminating evidence would be found.

*State v. George*, 2d Dist. Montgomery No. 25945, 2014-Ohio-4853, ¶ 28.

**{¶ 83}** As this Court previously noted:

> Courts and commentators have recognized that "consent [to search] may be implied by the circumstances surrounding the search, by the

person's prior actions or agreements, or by the person's failure to object to the search." Kuras, et al., Warrantless Searches and Seizures (2002), 90 Geo.L.J. 1130, 1172. "Thus a search may be lawful even if the person giving consent does not recite the talismanic phrase 'You have my permission to search.' * * *."

*State v. Lane*, 2d Dist. Montgomery No. 21501, 2006-Ohio-6830, ¶ 40.

**{¶ 84}** We initially note that Terrell mischaracterizes McCarty's testimony in asserting that the search he conducted of Terrell's person was not for weapons. McCarty testified that he was dispatched to the Marriott on the report of "suspicious" occupants in a vehicle engaged in suspected drug activity, namely coming and going from the hotel parking lot after making repeated trips to a room inside the hotel. McCarty testified that he and Osborne approached the vehicle described in the dispatch, and that thereafter Osborne, from the passenger side, informed McCarty that he intended to search the vehicle based upon a very strong odor of marijuana. McCarty testified that he requested Terrell's permission to search for "*any weapons*, or drugs or anything of that nature." (Emphasis added.) We note that "Ohio courts have long recognized that persons who engage in illegal drug activities are often armed with a weapon. * * * *State v. Evans*, 67 Ohio St.3d 405, 413, 1993-Ohio-186." *State v. Martin*, 2d Dist. Montgomery No. 20270, 2004-Ohio-2738, ¶ 17.

**{¶ 85}** We further note that the facts in *Alexander* are distinguishable from the matter herein; in *Alexander*, "the only drug violation for which Smith had a reasonable and articulable suspicion at the time of the pat-down search was the smoking of marijuana," and only one officer had approached Alexander's vehicle. *Id.*, *4. Here, two

officers responded to a report of drug activity, namely suspected drug trafficking, and the facts herein are accordingly more compelling than in *Alexander* to justify a pat down search.

{¶ 86} Further, we conclude that the record demonstrates that Terrell consented to the search and did not merely submit to a claim of authority. On direct examination, McCarty stated that Terrell indicated that he did not mind if McCarty searched him, and McMahan testified that Terrell consented to a search of his person. While McCarty's report indicated that Terrell responded that he "did not care," when asked for his consent to search, nothing in the record demonstrates that Terrell refused to give consent; McCarty testified, Terrell "didn't give an affirmative no." As noted above, consent may be implied by a person's failure to object to the search.

{¶ 87} Further, as the State notes, in *State v. Iacona*, 9th Dist. Medina No. CA 2891-M, 2000 WL 277911 (March 15, 2000), the defendant therein argued that the trial court erred in denying her motion to suppress, since law enforcement "illegally detained the Iacona family and * * * their consent to a search of the home was not voluntary." *Id.*, *8. The officer in *Iacona* "arrived at the home of Defendant after he received a dispatch that there was a dead baby in the basement of the home. Upon arrival, the patrolman was greeted by Defendant's mother, who invited him into the home." *Id.*, *9. The officer advised defendant's mother of the nature of the dispatch, and verbal consent to search the premises was provided by her in response to the officer's request, namely, "You mind if I take a look down the basement?" *Id.*, *9. Mrs. Iacona responded, "No. I don't care." *Id.* The Ninth District determined that the search of the residence "was conducted pursuant to a valid consent." *Id.*, *10.

{¶ 88} Finally, we note that there is no evidence in the record before us of coercive police conduct, or that Terrell was under duress, and there is no suggestion in the officers' testimony that Terrell's judgment was impaired. That Terrell indicated to Osborne that he did not want to answer questions about the female whom he was allegedly at the hotel to visit, and that he indicated to Mitchell, when asked for permission to search the room, that he wanted to speak to his attorney, suggest that Terrell was aware of his right to refuse consent. Finally, whether Terrell's consent was voluntarily given is a question of fact, and the trial court clearly credited McCarty's testimony, and we defer to the trial court's assessment of credibility. Under the totality of the circumstances, we find that Terrell's third assignment of error lacks merit, and it is accordingly overruled.

{¶ 89} Terrell's fourth assignment of error is as follows:

THE UNWARRANTED "PROTECTIVE SWEEP" OF APPELLANT'S HOTEL ROOM WAS A VIOLATION OF APPELLANT'S FOURTH AMENDMENT RIGHTS, AND WAS NOT SUPPORTED BY ANY EXIGENT CIRCUMSTANCES.

{¶ 90} Terrell asserts as follows:

* * * The State will attempt to argue that Officer McCarty claims to have heard the TV on in the room, and this created a reasonable fear that there might be another person in the room to destroy evidence. Officer McCarty is the only officer present during that search who claims to have heard the television on; however, even if true, it had absolutely no bearing on the officer's decision to enter the room. Further, upon entering the room, it was immediately apparent to the officers that the TV was on, yet

they proceeded with their "protective sweep" anyway.

This was not a scenario where the officers walked upstairs, knocked on the door, and heard frantic movement, or the frequent flushing of a toilet, leading them to believe that evidence actually was being destroyed, and necessitating that the officers kick the door down to preserve the evidence of the offense. Instead, the officers obtained a key from the front desk before they went upstairs. They had no reason to suspect evidence was being destroyed, nor a reason to believe that anyone was in the room, they had simply decided before they even got in the elevator that they were going to check in the room and make sure. Whether Officer McCarty heard the television when he arrived had no impact on the officers' decision.

**{¶ 91}** Terrell argues that "officers admitted at trial that they had no knowledge or reasonable belief that there was anyone else in the hotel room. Further, the officers certainly did not have a reasonable belief that the destruction of evidence was imminent, because at the time they made the warrantless entry the officers had no specific reason to believe that there even was evidence to destroy."

**{¶ 92}** According to Terrell, trial testimony "indicates that the officers never had the lights of their vehicle on when they pulled into the hotel. Appellant was in sight of the police at all times, and there is certainly no indication that he made a phone call during the encounter with the police." He argues that if a third party was present in Room 623, "it is extremely unlikely that they would be aware of what was going on in the parking lot, or know to start destroying evidence. Further, the officers indicated at trial that it was at least forty-five minutes between their initial interaction with Appellant, and the search of

Room 623." Terrell asserts that if "a third party was in the room, and unaware of the police, then the police created any exigency which may have existed by walking up to the room and announcing themselves, rather than simply waiting outside until a warrant could be obtained."

{¶ 93} The State responds that the "initial entry into the hotel room was based on exigent circumstances and only made for the purpose of securing the room to ensure that no evidence was destroyed." The State asserts that "the officers had a reasonable belief that someone else might be inside the hotel room because Appellant told Officer Osborn that there was a female in the hotel room that he was there to visit." According to the State, it "is also reasonable that that person in the room could destroy evidence because someone in a hotel room, expecting Appellant to return to the room as he had been doing all evening, could have easily looked out the window and seen Appellant interacting with officers and destroyed evidence." The State notes that Officer McCarty heard someone speaking, knocked on the door without response, and that such a circumstance "could lead to a reasonable belief that someone was in the room and destroying evidence."

{¶ 94} The State argues that even if this Court finds that "the initial entry into the room was unlawful, it did not affect the search conducted pursuant to the search warrant." According to the State, "all of the evidence obtained in this case is wholly dependent and in no way the product of the initial warrantless entry into the residence." The State notes that both "officer Osborne and Officer McCarty testified at the suppression hearing that they were in the hotel room for less than a minute and they only ensured that there was no one in the room that could destroy evidence."

{¶ 95} In reply, Terrell argues, regarding the State's assertion that the officers

believed someone else might be inside the hotel room, that "Detective Mitchell's affidavit shows that this is not true. The affidavit states that Appellant told Officer Osborn that he was at the hotel to meet a woman, but that she had not shown up yet." According to Terrell, the "State cannot base a claim of exigent circumstances on this statement of Appellant, because Appellant said that the woman was not there."

{¶ 96} Further, Terrell asserts that "it is clear that the officers did not believe Appellant about either the presence of a woman, or his room number. Appellant indicated that his room was 615, but officers searched Room 623 after speaking with hotel staff. The officers were further informed that only one person was staying in the hotel room."

{¶ 97} Finally, Terrell asserts as follows:

The State's argument that an exigent circumstance was created because Officer McCarty heard voices inside the room when officers were outside of it is similarly flawed. The voices were actually the television, and no one was in the room. The officers arrived at the room with every intent of entering it, regardless of any sounds they may have heard from inside. The officers obtained a key to the room from the front desk before ever going near the room, and the only reason to obtain the key is to open the door. The State cannot claim that an exigency was created by any voices Officer McCarty thought he heard when the officers went to the room with every intention of entering it.

{¶ 98} As this Court has previously noted:

"It is well recognized that police may enter a home without a warrant

where they have probable cause to search and exigent circumstances exist justifying the entry." *State v. Carr*, Montgomery App. No. 19121, 2002-Ohio-4201, ¶ 15, citing *Minnesota v. Olson* (1990), 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85. * * *

* * *

When officers secure a residence pending a search warrant, they may enter that residence. *State v. Carroll* (Nov. 30, 1994), Lorain App. Nos. 93CA005775 & 94CA005814 [1994 WL 665268], citing *State v. Swartz* (Sept. 12, 1990), Summit App. No. 14514 [1990 WL 131733], in turn citing *Segura [v. U.S.]*, supra, [468 U.S. 796,] at 798. However, this intrusion must be limited in time and scope. *Illinois v. McArthur* (2001), 531 U.S. 326, 331, 121 S.Ct. 946, 148 L.Ed.2d 838. Therefore, any entry based upon exigent circumstances is " 'strictly circumscribed by the exigencies which justif[ied] its initiation.' " *State v. Brewster*, 157 Ohio App.3d 342, 2004-Ohio-2722, ¶ 32, quoting *State v. Applegate*, 68 Ohio St.3d 348, 350, 1994-Ohio-356, in turn quoting *Terry v. Ohio* (1968), 392 U.S. 1, 26, 88 S.Ct. 1868, 20 L.Ed.2d 889. Thus, when a residence must be secured in order to preserve evidence, "the scope of the intrusion is limited to that necessary to secure the evidence." *State v. Martin*, Hamilton App. No. C-040150, 2004-Ohio-6433, ¶ 40, citing *United States v. Aquino* (C.A.10, 1970), 836 F.2d 1268, 1272; *Brewster,* supra, at ¶ 32. This may include securing "the people inside and any evidence in plain view." *Id. See, also, State v. Frankenhoff*, Licking App. No.2006CA00095, 2007-Ohio-2806, ¶ 6; *State v. Mitchell*, Cuyahoga

App. No. 88131, 2007-Ohio-3896, ¶ 32; *State v. Sturdivant*, Cuyahoga App. No. 87498, 2006-Ohio-5451, ¶ 2.

*State v. Burns*, 2d Dist. Montgomery No. 22674, 2010-Ohio-2831, ¶ 20, 22.

{¶ 99} As this Court noted in *State v. Striks*, 2015-Ohio-1401, 31 N.E.3d 208, ¶ 32-33 (2d Dist.):

* * * "Whether exigent circumstances are present is determined through an objective test that looks at the totality of the circumstances confronting the police officers at the time of the entry." *State v. Enyart*, 10th Dist. Franklin Nos. 08AP–184, 08AP–318, 2010-Ohio-5623, ¶ 21, citing *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir.1990). The United States Supreme Court has recognized only a few emergency conditions that qualify as exigent circumstances, one of which is "imminent destruction of evidence." [*State v.*] *Cheadle*, 2d Dist. Miami No. 00CA03, 2000 WL 966167 at *2. "[A] warrantless entry to prevent the destruction of evidence is justified if the government demonstrates: '1) a reasonable belief that third parties are inside the dwelling; and 2) a reasonable belief that these third parties may soon become aware the police are on their trail, so that the destruction of evidence would be in order.' " *United States v. Lewis*, 231 F.3d 238, 241 (6th Cir.2000), quoting *United States v. Sangineto–Miranda*, 859 F.2d 1501, 1512 (6th Cir.1988). *Accord State v. Goode*, 2d Dist. Montgomery No. 25175, 2013-Ohio-958, ¶ 18.

In addition, "[s]ecuring a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is

being sought is not itself an unreasonable seizure of either the dwelling or its contents." *Segura v. United States*, 468 U.S. 796, 810, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). *Accord Burns*, 2d Dist. Montgomery No. 22674, 2010-Ohio-2831, at ¶ 22 ("When officers secure a residence pending a search warrant, they may enter that residence").

**{¶ 100}** As this Court noted in *State v. Nelson,* 2d Dist. Montgomery No. CA9363, 1986 WL 9504, *6 (Aug. 22, 1986):

> * * * *Segura* holds that when the information on which a search warrant was secured came from an independent source and not from the original entry, evidence obtained lawfully under the warrant was admissible. Under such circumstances the illegality of the original entry is irrelevant on the admission of evidence and the "fruit of the poisonous tree" doctrine not applicable.

**{¶ 101}**  As noted above, the officers were dispatched to the scene on a report of suspected drug activity that involved Terrell repeatedly appearing in the parking lot and returning to his room in the hotel, activity that had occurred on a previous occasion. As further noted above, Terrell was deceptive about the circumstances of his presence at the hotel.  He was further misleading about the presence of the alleged female guest. Terrell initially advised Osborne that he was there to visit the female.  Mitchell testified that he learned from McCarty (via Osborne) that Terrell indicated that he was not a guest at the hotel but was visiting the female in Room 615.  McCarty, however, testified that Terrell advised him that he was a guest at the hotel, in Room 615, and that McMahan could vouch for his status as a registered guest.

{¶ 102} Osborne testified that he was instructed to secure Room 623, the room to which the officers eventually confirmed Terrell was registered. Osborne stated that he "checked it for people. That's it." He stated that he "didn't open anything or touch anything." Osborne stated that he did so because he "didn't know" if anyone was inside the room. Osborne, an experienced officer, stated that he believed that "there was some type of drug activity going on in" the hotel room based upon the strong odor of marijuana coming from the van, his familiarity with Terrell's and Minter's criminal history involving drug activity, and the report of suspected drug activity at the hotel by McMahan. Osborne stated that he was inside the room for "less than ten seconds" to "make sure there was nobody inside of the room to destroy anything that could be inside."

{¶ 103} Consistent with Osborne's testimony, McCarty testified that his intent in entering the room was "to secure it," and to make "sure there was nobody in there that could destroy any possible evidence *before we could search* it." (Emphasis added.) McCarty testified that he had reason to believe someone was inside the room because Terrell indicated "at some point, he was with some female in the room." Like Osborne, McCarty testified that the sweep of the room was limited in time and scope. He stated that he was in the room "[m]aybe a minute or less," and that as he walked through the room he checked between the beds and in the shower for people. Unlike Osborne, McCarty further testified that he heard "very faint voices" emanating from the room, thereby bolstering his concern that the room was occupied. We note that while Terrell asserts that the officers learned from the front desk that the room was registered to him alone, such that he was the sole occupant of the room, hotel personnel may not know if a registered guest has visitors.

{¶ 104} Most significantly, in the course of entering and securing the room pending the search warrant, the officers did not retrieve any evidence. In other words, the information that served as the basis for the search warrant, as noted above, came from sources independent of the original protective sweep. For the foregoing reasons, we conclude that Terrell's fourth assigned error lacks merit. It is accordingly overruled.

{¶ 105} On January 18, 2017, Terrell filed a motion for leave to file a supplemental brief, as well as a supplemental brief, and this Court granted the motion on January 24, 2017. Terrell directed this Court's attention to *State v. Gonzales*, Ohio Supreme Court Slip Opinion No. 2016-Ohio-8319 ("*Gonzales I*"), asserting two assignments of error as follows:

APPELLANT'S CONVICTION TO [sic] A FELONY OF THE FIRST DEGREE UNDER R.C. §2925.11(C)(4)(e); AND A FELONY OF THE FIRST DEGREE UNDER §2925.03(C)(4)(f); WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PURSUANT TO THE OHIO SUPREME COURT'S DECISION IN *STATE V. GONZALES*.

And,

THE TRIAL COURT'S JURY INSTRUCTION AND APPELLANT'S SENTENCE TO A MANDATORY TERM OF INCARCERATION CONSTITUTE PLAIN ERROR.

{¶ 106} We initially note that Megan Snyder testified at trial that she is a forensic scientist in the drug chemistry section of the Ohio Bureau of Criminal Investigations. She testified via video deposition at trial that she tested two samples of substances retrieved

from Terrell's hotel room and confirmed that they were cocaine. She stated that one of the samples weighed 42.53 grams, and one of them weighed 42.34 grams, for a total weight of 84.87 grams.

{¶ 107} As this Court previously noted:

When a defendant challenges the sufficiency of the evidence, he is arguing that the State presented inadequate evidence on each element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471 N.E.2d 594 (2d Dist. 2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

Our analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The

discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

*State v. Anderson,* 2d Dist. Montgomery No. 26917, 2016-Ohio-5157, ¶ 12-13.

**{¶ 108}** R.C. 2925.11 provides in relevant part:

(A) No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog.

* * *

(C) Whoever violates division (A) of this section is guilty of one of the following:

* * *

(4) If the drug involved in the violation is cocaine or a compound, mixture, preparation, or substance containing cocaine, whoever violates division (A) of this section is guilty of possession of cocaine. The penalty for the offense shall be determined as follows:

* * *

(e) If the amount of the drug involved equals or exceeds twenty-seven grams but is less than one hundred grams of cocaine, possession of cocaine is a felony of the first degree, and the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the first degree.

**{¶ 109}** R.C. 2925.03 provides in relevant part:

(A) No person shall knowingly do any of the following:

* * *

(2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.

* * *

(C) Whoever violates division (A) of this section is guilty of one of the following:

* * *

(4)   If the drug involved in the violation is cocaine or a compound, mixture, preparation, or substance containing cocaine, whoever violates division (A) of his section is guilty of trafficking in cocaine.   The penalty for the offense shall be determined as follows:

* * *

(f)   If the amount of the drug involved equals or exceeds twenty-seven grams but is less than one hundred grams of cocaine and regardless of whether the offense was committed in the vicinity of a school or in the vicinity of a juvenile, trafficking in cocaine is a felony of the first degree, and the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the first degree.

**{¶ 110}**  As this Court has previously noted:

In order to constitute plain error, the error must be an obvious defect in the proceedings, and the error must have affected substantial rights. *State v. Barnes*, 94 Ohio St.3d 21, 2002-Ohio-68, 759 N.E.2d 1240. Under the plain error doctrine, errors affecting substantial rights may be noticed on appeal although they were not brought to the attention of the trial court. Crim.R. 52(B).

*State v. Henley*, 2d Dist. Montgomery No. 26604, 2015-Ohio-4113, ¶ 10.

{¶ 111} Rafael Gonzales was convicted of possession of cocaine, and the jury found that "the amount of cocaine involved equaled or exceeded 100 grams." *Gonzales I*, ¶ 5. Gonzales received a mandatory sentence of 11 years. *Id*. In *Gonzales I*, the Supreme Court of Ohio recognized a conflict between *State v. Gonzales,* 6th District Wood No. WD-13-086, 2015-Ohio-461, ¶ 47 ("Because the state failed to introduce evidence as to the purity or weight of the cocaine in this case, we find that appellant's penalty enhancement under R.C. 2925.11(C)(4)(f) must be reversed and vacated."), and this Court's decision in *State v. Smith*, 2d Dist. Greene No. 2010-CA-36, 2011-Ohio-2568, ¶ 12 ("Case law does not support Smith's claim that the State was required to segregate the cocaine from the other ingredients in the substance."). The Court considered the following certified question: "Must the state, in prosecuting cocaine offenses involving mixed substances under R.C. 2925.11(C)(4)[(b)] through (f), prove that the weight of the cocaine meets the statutory threshold, excluding the weight of any filler materials used in the mixture?" *Gonzales I*, ¶ 1.

{¶ 112} The Supreme Court noted that it found "nothing in the language of R.C. 2925.11(C)(4)(f) to be ambiguous. By its plain terms, the statute prohibits the

possession of 100 grams or more of cocaine." *Id.*, ¶ 20. The Court concluded that "in prosecuting cocaine-possession offenses under R.C. 2925.11(C)(4)(b) through (f) involving mixed substances, the state must prove that the weight of the actual cocaine, excluding the weight of any filler materials, meets the statutory threshold." *Id.*, ¶ 22.

{¶ 113} Terrell asserts that *Gonzales I* applies retroactively, and that it applies both to cases involving possession of cocaine, and cases involving trafficking in cocaine. He asserts that *Gonzales I* "requires the State to prove that the amount of pure cocaine involved in an alleged first degree felony offense for trafficking in or possession of cocaine is at twenty-seven grams," and that the "State presented no evidence regarding the purity of the cocaine, or the amount of pure cocaine." Finally, he asserts that the trial court's "failure to instruct the jury that the State must prove the amount of pure cocaine, excluding fillers, involved in Appellant's alleged offenses constitutes plain error." The State responds that *Gonzales I* does not apply retroactively.

{¶ 114} On March 7, 2017, the State filed a "Notice of Additional Authority," directing this Court's attention to *State v. Gonzales*, Ohio Supreme Court Slip Opinion No. 2017-Ohio-777 ("*Gonzales II*"), in which the Supreme Court reconsidered its decision in *Gonzalez I* on the State's motion. The Court noted that "[r]ead as a whole, the plain language of R.C. 2925.11(C)(4)(b) through (f) penalizes an offender for the amount of cocaine possessed, and the amount of 'cocaine' clearly encompasses the whole compound or preparation of cocaine, including fillers that are part of the usable drug." *Id.*, ¶ 9. The Court further noted that pursuant to R.C. 2925.01(X)(3), the "statutory definition of 'cocaine' includes a 'salt, compound, derivative, or preparation' of a substance that is cocaine salt or base cocaine," and that "the statutory definition of

cocaine plainly encompasses a compound or preparation that includes cocaine." *Id.,* ¶ 10. The Court defined "compound" as " 'something (as a substance * * *) that is formed by a union of * * * ingredients.' *Webster's Third New International Dictionary* 466 (1986)." *Id.* The Court concluded that "this is consistent with the nature of the cocaine used illegally in the United States, which is a compound of several ingredients." *Id.*, ¶ 11.

{¶ 115} It was significant to the Court that "the fillers, or adulterants, that are part of powder cocaine are not intended to be removed before consumption. Indeed, the fillers are an inherent part of powder cocaine." *Id.*, ¶ 12. The Court noted that "the common usage of the term 'cocaine' is consistent with the statutory definition that a compound or preparation of cocaine is still cocaine," and the Court concluded that "the total weight of the drug, including any fillers that are part of usable cocaine, should be weighed to determine the appropriate cocaine-possession penalty under the statute." *Id.* According to the Court, the "statute is unambiguous," and "[i]f the General Assembly had been concerned about purity, rather than total weight, it would have said so." *Id.*, ¶ 13-14. The Court concluded that "the applicable offense level for cocaine possession under R.C. 2925.11(C)(4) is determined by the total weight of the drug involved, including any fillers that are part of the usable drug." *Id.*, ¶ 18.

{¶ 116} Based upon the Supreme Court's decision in *Gonzales II*, we conclude that Terrell's supplemental assignments of error lack merit. In other words, Terrell's convictions are supported by sufficient evidence and not against the manifest weight of the evidence, the trial court did not commit plain error in failing to instruct the jury that the State was required to prove that the amount of pure cocaine, excluding fillers, at issue in Terrell's offenses was at least 27 grams, and Terrell's sentence does not constitute plain

error, since his 11-year sentence for a first degree felony is within the statutory range of R.C. 2929.14(A)(1). Terrell's supplemental assignments of error are accordingly overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and WELBAUM, J., concur.

Copies mailed to:

Megan M. Farley
Roger Soroka
Joshua Bedtelyon
Hon. Douglas M. Rastatter